**John E. DONOUGHE and Helen M. Donoughe, Appellants**

**v.**

**LINCOLN ELECTRIC CO., and Hobart Brothers, Appellees.**

**John E. Donoughe and Helen M. Donoughe, H/W, Appellees**

**v.**

**Hobart Brothers Company and Lincoln Electric Company, Appellants.**

Superior Court of Pennsylvania.

Argued Jan. 9, 2007.

Filed Oct. 12, 2007.

Reargument Denied Dec. 13, 2007.

---

Robert E. Paul, Philadelphia, for Donoughe.

David G. Klaber, Pittsburg, for Hobart and Lincoln.

BEFORE: STEVENS, McCAFFERY, and KELLY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Before the Court are cross-appeals from a judgment entered against Hobart Brothers Company ("Hobart"); the Lincoln Electric Company ("Lincoln"); and nine other manufacturers of asbestos products, in favor of John E. and Helen Donoughe, husband and wife (collectively, "Donoughe"), in the total amount of $396,000, plus post-verdict interest. After careful review, we affirm as to Lincoln's and Hobart's claims, and vacate and remand as to Donoughe's claim.

¶ 2 The factual and procedural history of this case, as set forth by the trial court, is as follows:

[This] asbestos case was tried before the Honorable James Murray Lynn and a jury as a reverse bifurcated trial. In the first phase, the jury found that Plaintiff[,] John E. Donoughe was exposed to asbestos that resulted in his development of lung cancer and awarded him $360,000.00, and his wife, Helen Donoughe[,] $36,000.00, for loss of consortium. In Phase II, the jury found Defendants, Lincoln [ ] and Hobart, liable for the injury sustained by [Donoughe].

\* \* \* \* \* \*

The evidence at trial established that the Plaintiff, John E. Donoughe, worked with the Penn Central Railroad, which later became Conrail and Norfolk Southern, [from] 1974 through 2000. Mr. Donoughe worked as a welder at the railroad shop, and [approximately one-quarter] of [his] time from 1974 through 1977, repair[ed] air brakes. He stated that numerous products in the railroad shop were labeled as containing asbestos. Mr. Donoughe testified that he was exposed to asbestos dust and inhaled this dust from [Lincoln's and Hobart's] welding rods when they were removed from containers.... Mr. Donoughe was diagnosed with lung cancer in 2001.

[Donoughe's] medical expert, Dr. Harvey Spector, testified that all exposures to asbestos [are] a substantial factor in causing lung cancer[,] such as that suffered by Mr. Donoughe. Dr. Paul E. Epstein also testified on [Donoughe's] behalf. Dr. Epstein testified that each and every breath of asbestos was a substantial contributing factor to cancer. He also opined that the dust [to which] Mr. Donoughe was exposed [ ] would have been a factual cause of the lung cancer that he developed.

On May 6, 2005, the jury awarded [Donoughe] $396,000.00 in damages. On May 13, 2005, [Donoughe] filed a Motion to Mold the Verdict. On May 20, 2005, [Lincoln and Hobart] filed a Motion for Post–Trial Relief.

(Trial Court Opinion, dated June 13, 2006, at 1–3; citations to the record omitted; footnote omitted).[1] Also at the same trial,

---

1. The trial court wrote two opinions, each dated June 13, 2006, pursuant to Pa.R.A.P. 1925(a). One opinion addressed the issues raised on appeal by Lincoln and Hobart, and the other addressed the issues raised on appeal by Donoughe. The factual and procedural history quoted above is from the first opinion; however, the recitation of the factual

Donoughe obtained a verdict against nine other asbestos manufacturers, including Johns–Manville Corporation, which settled with Donoughe. None of these other defendants are parties to this appeal.

¶ 3 The trial court denied the post-trial relief sought by Donoughe and that sought by Lincoln and Hobart. The parties filed timely cross-appeals, with Lincoln and Hobart raising their joint issues in a single brief. The issues presented by Lincoln and Hobart are as follows:

1. May a trial court refuse to address the points of error outlined in an appropriate [Rule] 1925(b) statement of issues on appeal and deem those issues waived, when the statement was organized, clearly articulated, and did not raise an "outrageous" number of issues?

2. Can a plaintiff prove a product caused an asbestos injury (a) by testifying that he saw "dust" while handling it, when plaintiff's testimony lacked any foundation that the "dust" contained asbestos and, (b) without presenting any expert testimony to establish actual release of respirable asbestos from products allegedly containing encapsulated asbestos?

3. May a trial court refuse to conduct a risk-utility analysis under *Azzarello v. Black Bros. Co.*, [480 Pa. 547] 391 A.2d 1020 (Pa.1978) when the product has substantial utility and there is no competent evidence that the product posed any risk of an asbestos-related injury?

4. Can a manufacturer of welding rods be held liable under § 402A for exposure to welding slag, which is not a product but a byproduct of the welding process?

5. May a trial court refuse to provide any relief for [Lincoln and Hobart], such as the granting of a continuance, the striking of testimony or the preclusion of witnesses, when [Donoughe's] failure to comply with the rules of discovery and a court order resulted in a trial by ambush that deprived [Lincoln and Hobart] of their due process right to a fair trial?

5. May a trial court impose reverse bifurcation over [Lincoln's and Hobart's] objections when [Donoughe's] Phase I damage evidence necessarily taints jury deliberations on Phase II issues?

6. May a medical expert who has provided no expert report offer opinions on non-medical issues on which he has no expert qualifications?

(Lincoln's and Hobart's Brief at 5).[2]

¶ 4 Donoughe raises the following single issue for our review:

Did the lower court err when it refused to mold the verdict to address the shortfall between the amount paid by Johns–Manville Corporation pursuant to its *pro tanto* release with [Donoughe] and the *pro rata* share allocated Manville by the verdict?

(Donoughe's Cross–Appellants' Brief at 2).[3]

and procedural history in the second opinion is nearly identical to that of the first opinion.

**2.** We have reordered the sequence of Lincoln's and Hobart's issues to comport with the sequence of our disposition.

**3.** Donoughe filed an Appellee's Brief and a Cross–Appellant's Brief, the two bound, one following the other, as a single document.

### Lincoln's and Hobart's Issues

### (1) Rule 1925(b) Waiver

¶ 5 Following receipt of Lincoln's and Hobart's Pa.R.A.P.1925(b) "Concise Statement of Matters Complained of on Appeal," the trial court wrote an opinion in which it determined that all of Lincoln's and Hobart's appellate issues had been waived. The court concluded that because Lincoln and Hobart had "attempted to overwhelm" the court "by filing a Rule 1925(b) Statement that contained a multitude of issues that they cannot possibly intend to raise and/or could raise before" this Court, Lincoln and Hobart had violated the dictates of Rule 1925(b) as interpreted by case law. (Trial Court Opinion, reviewing Lincoln's and Hobart's issues, at 10). Lincoln's and Hobart's Rule 1925(b) Statement is slightly over four pages long [4] and set forth, according to the trial court, twelve issues that the trial court had difficulty understanding.[5] Determining that meaningful review of Lincoln's and Hobart's appellate issues was not possible because (1) it was required to guess what those issues were, and (2) the sheer volume of issues evidenced Lincoln's and Hobart's "misconduct" and lack of "good faith," the trial court concluded that all of Lincoln's and Hobart's issues were waived. (*Id.* at 10).[6]

¶ 6 In reaching its determination, the trial court relied principally on *Kanter v. Epstein*, 866 A.2d 394 (Pa.Super.2004), *appeal denied*, 584 Pa. 678, 880 A.2d 1239 (2005), *cert. denied sub nom. Spector, Gadon & Rosen, P.C. v. Kanter*, 546 U.S. 1092, 126 S.Ct. 1048, 163 L.Ed.2d 858 (2006), and its progeny. In *Kanter*, this Court held that when an appellant raises an "outrageous" number of issues in a Rule 1925(b) statement, the appellant has deliberately violated both the letter and spirit of Rule 1925(b) and has rendered appellate review of any issues meaningless. *Id.* at 401. In *Kanter*, one appellant filed a fifteen-page Rule 1925(b) statement setting forth fifty-five issues, and the other appellant filed a fifteen-page Rule 1925(b) statement setting forth forty-nine issues. We determined that the excessive listing of issues required that the trial court "guess" as to the actual issues the appellants intended to argue on appeal, effectively precluding meaningful review. *Id.* As we observed in *Kanter*, Pa.R.A.P. 2116(a) requires that the statement of questions set forth in an appellate brief should not ordinarily exceed fifteen lines and must never exceed one page. Therefore, when an appellant submits a Rule 1925(b) statement that sets forth many more issues than could possibly be raised before the appellate court within the restrictions of Rule 2116(a), a trial court is placed in the inappropriate position of having to "guess" as to the actual issues the appellant will eventually raise in his or her appellate brief. *Id.*

¶ 7 However, where a Rule 1925(b) statement, although several pages in length, plainly describes the issues on appeal, and, when stripped of sub-arguments or other extraneous verbiage, would appear to be able to fit upon a single page, then a determination that the issues were waived is inappropriate. *See Pennsy Supply, Inc. v. Mumma*, 921 A.2d 1184, 1197

---

**4.** The trial court stated that it was six pages long.

**5.** The court queried: "Are [Lincoln and Hobart] claiming [that] this [c]ourt abused its discretion, entered a verdict against the weight of the evidence, that the evidence was insufficient to sustain the verdict, or a combination of all three (3)?" (*Id.* at 8–9).

**6.** Because of its determination, the trial court did not address the substance of Lincoln's and Hobart's issues, except to note generally that the evidence supported the jury's verdict.

(Pa.Super.2007) (holding that a seven-page Rule 1925(b) statement, although containing unnecessary and superfluous language largely directed at answering the questions on appeal, was not so vague as to preclude a clear understanding of the issues raised); *McGavitt v. Guttman Realty Co.*, 909 A.2d 1, 3–4 (Pa.Super.2006) (holding that a six-page Rule 1925(b) statement, although containing superfluous discussion, sufficiently set forth the appellant's four issues, all of which would have fit on a single page, and thus did not preclude the trial court from conducting a comprehensive analysis of the issues).[7]

¶ 8 Here, Lincoln's and Hobart's Rule 1925(b) statement essentially mirrors their Rule 2116(a) statement of questions involved, absent the issue regarding whether the trial court erred by finding a waiver of all issues under Rule 1925(b). The essential differences between the statement of questions involved and the longer Rule 1925(b) statement are (1) the extra degree of detail set forth in the Rule 1925(b) statement; (2) the separate framing of related issues in the Rule 1925(b) statement that were consolidated more generally in the statement of questions involved; and (3) the fact that the Rule 1925(b) statement had been typed in double space as opposed to the single-spaced typing of the statement of questions involved.[8] Moreover, as is readily apparent from the issues raised by Lincoln and Hobart in their Rule 2116(a) statement of questions involved, quoted above, the allegations of error are fairly straightforward and are not vague. Therefore, under these circumstances, we disagree with the trial court's determination that Lincoln and Hobart have waived all issues on appeal.[9]

## (2) Denial of motion for JNOV

¶ 9 Lincoln's and Hobart's first three substantive issues relate to its contention that the trial court erred by denying their motion for judgment notwithstanding the verdict ("JNOV"). Our review is therefore informed by the following principles:

> Our scope of review with respect to whether JNOV is appropriate is plenary, as with any review of questions of law. It is axiomatic that[ ] there are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to *judgment as a matter of law, and/or two,* the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. To uphold JNOV on the first basis, we must review the record and conclude that even with all the factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second we review the evidentiary record and conclude that the evidence was such

---

7. We also note that our Supreme Court has recently amended Pa.R.A.P.1925(b) in many significant respects, effective July 25, 2007. In particular, we observe that the amended Rule provides in relevant part: "Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver." Pa.R.A.P.1925(b)(4)(iv). However, the amendment to Rule 1925(b) does not apply to the case *sub judice* because the notice of appeal was filed prior to the effective date of the Rule's amendment.

8. The Rule 1925(b) statement also contained approximately two additional allegations of errors on evidentiary rulings not raised in the statement of questions involved.

9. Although the trial court did not specifically address Lincoln's and Hobart's issues in its Rule 1925(a) opinion, in the interests of judicial economy, we shall proceed to address Lincoln's and Hobart's issues without remanding to the trial court for its analysis.

that a verdict for the movant was beyond peradventure.

When we review a motion for JNOV, we must consider the evidence in the light most favorable to the verdict winner, who must receive the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Any doubts must be resolved in favor of the verdict winner, and JNOV should only be entered in a clear case. Finally, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.

*Rohm and Haas Co. v. Continental Casualty Co.*, 566 Pa. 464, 471–72, 781 A.2d 1172, 1176 (2001) (citations and quotation marks omitted). We further note, and emphasize, that the entry of a JNOV "is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury." *Bugosh v. Allen Refractories Co.*, 932 A.2d 901, 907 (Pa.Super.2007) (citation omitted).

### (a) Sufficiency of Donoughe's Evidence

¶ 10 Lincoln and Hobart first argue that Donoughe failed to present competent evidence that Lincoln's and Hobart's welding rods either contained asbestos or released asbestos fibers, or that Donoughe inhaled respirable asbestos fibers from Lincoln's

and Hobart's welding rods that caused his asbestos-related disease.[10] Our review of this argument necessitates an understanding and explanation of what is necessary to successfully establish a products liability asbestos claim.

■ ¶ 11 In all products liability cases, the plaintiff must prove (1) the existence of a defect in the product that was present at the time the product left the control of the manufacturer; and (2) that the defect caused the plaintiff's injuries. *Hadar v. AVCO Corporation*, 886 A.2d 225, 228 (Pa.Super.2005), *appeal denied*, 586 Pa. 758, 895 A.2d 550 (2006); *Schindler v. Sofamor, Inc.*, 774 A.2d 765, 771 (Pa.Super.2001). "The threshold question of whether the product is defective may be shown in two ways: proof of a manufacturing defect or proof of a design defect. A subcategory of design defect includes inadequate warning, to the user or consumer, of the defect or dangerous propensity of the product." *Hadar, supra* at 228 (citations and quotation marks omitted). In the case *sub judice*, Donoughe alleges that Lincoln's and Hobart's welding rods were defective because of a failure to warn users, including Donoughe, of their dangerous propensities. "A product is defective due to a failure-to-warn where the product was distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Phillips v. A–Best Products Co.*, 542 Pa. 124, 131,

---

10. More specifically, Lincoln and Hobart argue that Donoughe offered no competent *expert* evidence that the welding rod dust he observed consisted of asbestos fibers and that his lay testimony was inadequate to satisfy his burden of proof. Further, Lincoln and Hobart argue that Donoughe failed to offer any competent expert opinion as to whether the dust Donoughe saw and inhaled was "respirable" asbestos (*i.e.*, asbestos fibers small enough to enter the lungs), in consideration of Lincoln's and Hobart's "unrebutted" testimony from an expert witness that welding rods

could not release "respirable" asbestos. Lincoln and Hobart also note that their expert witness had testified that the welding process destroys asbestos fibers, thus preventing a release of harmful dust. In sum, Lincoln and Hobart contend that the trial court erred by allowing the jury to consider whether Lincoln and Hobart were liable for Donoughe's injuries when there was, purportedly, no competent evidence that their products contained or released asbestos fibers capable of entering Donoughe's lungs. (*See, generally*, Lincoln's and Hobart's Brief at 23–36).

665 A.2d 1167, 1171 (1995) (quoting *Mackowick v. Westinghouse Electric Corp.*, 525 Pa. 52, 56, 575 A.2d 100, 102 (1990)).

¶ 12 In a products liability case involving asbestos exposure, a plaintiff must present evidence that he or she inhaled asbestos fibers shed by the defendant's product. *Bugosh, supra* at ¶ 8. "[I]deally, a plaintiff will be able to directly testify that [he or she] breathed in asbestos fibers and that those fibers came from the defendant's product." *Id.* (quoting *Gilbert v. Monsey Products Co.*, 861 A.2d 275, 276 (Pa.Super.2004)). However, absent such direct evidence, a plaintiff may rely on circumstantial evidence of exposure, namely, "the frequency of the use of the product and the regularity of [his or her] employment in proximity thereto." *Id.*; *see also Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50, 53 (1988).

¶ 13 There is guidance from our case law regarding the quantum and nature of proof required to establish a plaintiff's claim that he or she contracted an asbestos-related disease as a result of exposure to a defendant's product. In *Gibson v. Workers' Compensation Appeal Board (Armco Stainless & Alloy Products)*, 580 Pa. 470, 861 A.2d 938 (2004),[11] our Supreme Court determined that the evidence adduced by the claimant was **insufficient** to establish that the claimant's decedent had been exposed to asbestos at the worksite, for the following reasons: (1) no witness with first-hand knowledge testified that there was asbestos in the workplace; (2) a workplace witness testified that the decedent had worked near dusty "cottony" material that he was personally not able to identify but he believed to be asbestos based on "what people said;" (3) no witness with first-hand knowledge testified that the decedent had asbestos-related disease; and (4) no medical record indicated that the decedent had spoken to any physician about an exposure to asbestos. *Id.* at 483–84, 861 A.2d at 946.[12]

¶ 14 However, the *Gibson* Court cited with approval this Court's disposition of an appeal of a products liability asbestos case, *Harahan v. AC & S, Inc.*, 816 A.2d 296 (Pa.Super.2003), where, by contrast, this Court determined that the evidence **was sufficient** to establish that a worker had been injured from exposure to asbestos emanating from the defendant's product. In *Harahan*, the evidence showed that the decedent died from an asbestos-related disease and that a pipe sealant and roofing cement, to which the decedent had been exposed at the workplace, contained asbestos and shed asbestos dust which the decedent had inhaled. Our Supreme Court observed that in *Harahan*,

[t]he presence of asbestos in the workplace was established by the **lay** opinion testimony of two co-workers. One worker testified that the sealant containing asbestos went on as a clear liquid but created dust when it dried. Dust came from around the pipes, from their clothes, from the air, and from their tools. He indicated that he knew that the product contained asbestos because **"it said asbestos on the cans."** ... He further testified as to the product's reg-

---

**11.** Although *Gibson* involved a claim brought under the Workers' Compensation Act, and thus was an appeal from an administrative agency adjudication, our Supreme Court nevertheless centered its analysis on the Rules of Evidence deemed fundamental to any adjudication.

**12.** The *Gibson* Court concluded that it was error for the workers' compensation judge to admit testimony from a lay witness concerning the decedent's exposure to asbestos when that witness had no actual knowledge that the decedent had been exposed to asbestos. *Id.* at 947–48.

ularity of use, the frequency of inhalation, the lack of respiratory protection, and [thus] credibly established the presence of asbestos in the workplace ***through personal knowledge.***

*Gibson, supra* at 484–85, 861 A.2d at 947 (emphasis added; citations to *Harahan* omitted).

¶ 15 In *Bugosh, supra,* this Court rejected challenges to the sufficiency of the evidence which established that plaintiff's decedent had contracted a fatal asbestos-related disease following his exposure to the defendants' asbestos-containing products during the course of his working career. The first defendant argued that it was entitled to JNOV because the evidence against it consisted only of lay testimony given by a co-worker of the decedent regarding the latter's exposure to asbestos. The co-worker testified that as a storeroom attendant he handed out to employees, including the decedent, various asbestos-containing products, including a mill board manufactured by the defendant. However, because the co-worker could not recall whether he had distributed the defendant's products to the decedent during a specific one-year period when the defendant owned the franchise rights to the mill board, the defendant argued that the plaintiff's evidence lacked direct proof of exposure to dust from the defendant's product. Our Court disagreed, determining that the trial court correctly concluded that the issue of whether the decedent had been exposed to dust from the defendant's asbestos-containing product was one properly decided by the jury, which was free to evaluate the credibility and weight of the evidence presented. *Id.* at ¶¶ 12–13.

¶ 16 Another defendant in *Bugosh* argued that the trial court erred by not granting its motion for a compulsory nonsuit or a directed verdict based on allegations that no evidence established that the decedent had worked in frequent, regular, or close proximity to asbestos products, particularly in light of the defendant's contention that its evidence showed that no asbestos dust was released from the defendant's glass-tempering oven during its normal operation. However, this Court noted that *lay* testimony showed that the decedent had been exposed to asbestos dust while sweeping the floor in conjunction with repair work conducted by the defendant's employees, where the oven had been torn down for modifications and where during the repairs, the defendant's employees used cement from bags that were labeled with the word "asbestos." Based upon this evidence, this Court found no basis upon which to grant the defendant relief.

¶ 17 Similarly, in *Juliano v. Johns–Manville Corporation,* 416 Pa.Super. 321, 611 A.2d 238, 240 (1992), this Court determined that it was the within the province of the jury to evaluate whether the plaintiff's *lay* testimony that he had been exposed to dust from a product marked as containing asbestos was rebutted by the defendant's evidence that its product did not contain asbestos during the time the plaintiff worked with the product. Also, in *Gilbert, supra,* 861 A.2d at 276–77, the plaintiff was able to defeat the defendants' summary judgment motion because he established that he had been exposed to asbestos from the defendants' products based on his lay testimony that he had worked with these products and inhaled fibers emanating from them. *See also Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643, 652–53 (Pa.Super.2002) ("The testimony of any witness with knowledge regarding the plaintiff's workplace and his or her exposure to a defendant's asbestos-containing products is admissible when probative.").

 ¶ 18 Guided by the above authority, we have no hesitation in concluding that the evidence presented in the case *sub judice*, when viewed in the light most favorable to Donoughe as the verdict-winner, supports the jury's determination that Donoughe inhaled asbestos fibers from Lincoln's and Hobart's products, substantially contributing to Donoughe's lung cancer. During Phase I of the trial, Dr. Spector, a board-certified pathologist, testified that Donoughe's lung cancer was caused by his inhalation of asbestos fibers, and that each asbestos exposure was a substantial contributing factor in the development of Donoughe's cancer. During Phase II of the trial, Donoughe testified that he worked as a welder from 1974 to 2000, and during that time used Number 6011 welding rods, some of which were manufactured by Lincoln, and some of which were manufactured by Hobart. Donoughe knew that he had used 6011 welding rods manufactured by Lincoln and Hobart because he saw the respective manufacturer's name on the boxes of rods and the number 6011 on the rods themselves. Donoughe also testified that he inhaled dust emanating from the welding rods when he removed them from their containers and when he chipped, wire-brushed, or chiseled off a residue coating, known as slag, that was formed after the weld. He further testified that there were no warnings on the containers or rods concerning the dangers of inhaling asbestos dust. Dr. Epstein then testified that each and every inhalation of asbestos from any asbestos product, including welding rods, substantially contributes to asbestos-related diseases, such as Donoughe's lung cancer.

¶ 19 Also during Phase II of the trial, Donoughe introduced evidence that the Lincoln and Hobart 6011 welding rods, which Donoughe had worked with and which emanated dust that he breathed, contained and were manufactured with asbestos. A Hobart document introduced into evidence indicated that all Hobart 6011 welding rods were manufactured with asbestos until November 1975. An article written by a Lincoln employee introduced into evidence showed that all Lincoln 6011 welding rods contained asbestos.[13] The significant substance of this article was corroborated by a Lincoln employee, who also admitted that Lincoln made asbestos-containing 6011 welding rods until 1981.

¶ 20 Based upon the above evidence, and in light of the ample guidance provided by relevant case law, there is no question that Donoughe presented sufficient evidence for the jury to find that he had inhaled asbestos fibers shed by Lincoln's and Hobart's products. *Bugosh, supra* at ¶ 8. Donoughe introduced evidence that he suffered from an asbestos-related disease, that Lincoln's and Hobart's welding rods contained asbestos, and that Donoughe inhaled dust emanating from the asbestos-containing rods both when they were removed from their containers and when he chipped or degraded substances that accumulated on the rods during their use. Donoughe's evidence was comparable to that introduced in the cases cited above and which was determined to be sufficient to proceed to a jury determination or to support the jury's verdict for the plaintiff. Therefore, Lincoln's and Hobart's contention that Donoughe's lay testimony was insufficient to establish that he had inhaled asbestos dust emanating from their welding rods is without merit.

¶ 21 Also without merit is Lincoln's and Hobart's argument that Donoughe failed

---

**13.** The documents referring to the asbestos content of the Hobart and Lincoln 6011 welding rods were admitted into evidence without objection. (Notes of Testimony Trial ("N.T."), 5/3/05, at 20).

to prove that any asbestos dust that he had inhaled from their welding rods was "respirable." This argument is based on select portions of testimony given by two experts who testified for Lincoln and Hobart. Thomas Eager, a metallurgist, opined that fibers released from welding rods, being larger than 10 microns, were too large to be aspirated, and further opined that during the welding process, asbestos particles would be turned into slag and thus would not be capable of being inhaled. William Hughson, M.D., a pulmonologist and epidemiologist, opined that particles larger than 10 microns cannot enter the lungs. Based upon this evidence, Lincoln and Hobart contend that Donoughe failed to establish that the purportedly unidentified dust that he had observed coming from the welding rods had contributed to his asbestos-related disease.

¶ 22 However, Lincoln and Hobart fail to consider that the testimony of their experts, who were subject to cross-examination, was a matter for the jury to accept in full, accept in part, or reject completely. *Martin v. Evans,* 551 Pa. 496, 505, 711 A.2d 458, 463 (1998) (citation omitted) ("A jury is entitled to believe all, part or none of the evidence presented.... A jury can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve"). Indeed, this Court has rejected arguments similar to the instant one made by Lincoln and Hobart on the basis that the jury was free to reject purportedly "unrebutted" evidence showing that the plaintiff could not have been injured by any asbestos exposure from the defendant's product. *See Cauthorn v. Owens Corning Fiberglas Corp.,* 840 A.2d 1028, 1033, 1038–39 (Pa.Super.2004) (holding jury was free to disregard defendant's expert testimony that the product emitted levels of respirable asbestos too low to be harmful); *Junge v. Garlock, Inc.,* 427 Pa.Super. 592, 629 A.2d 1027, 1029–30 (1993) (holding plaintiff establishes a *prima facie* case by showing that he or she inhaled asbestos fibers shed by the defendant's product even where the defendant presents "unrebutted" expert reports contending that the defendant's "encapsulated" product could only emit a level of asbestos too low to have been a substantial factor in causing the plaintiff's asbestos-related disease).

¶ 23 Moreover, when considering the propriety of entering JNOV, the trial court must be mindful that the evidence must be considered in the light most favorable to the verdict-winner, who receives the benefit of every reasonable inference of fact arising from the evidence, and that any conflict in the evidence must be resolved in the verdict-winner's favor. *Rohm and Haas, supra* at 472, 781 A.2d at 1176. Here, Donoughe presented evidence that he inhaled dust shed by Lincoln's and Hobart's asbestos-containing welding rods. He further presented evidence that each asbestos exposure was a substantial contributing factor in his development of lung cancer. Thus, no basis for entering JNOV exists, and Lincoln's and Hobart's many-tiered argument attacking the sufficiency of Donoughe's evidence, which in sum is simply a contention that judgment should have been entered based on the evidence favorable to them, is completely without merit.

### (b) *Azzarello* Risk–Utility Analysis

¶ 24 Next, Lincoln and Hobart argue that the trial court erred by refusing their motion for JNOV based on their contention that the risk/utility analysis, required for products liability cases under *Azzarello v. Black Brothers Co., Inc.,* 480 Pa. 547, 558, 391 A.2d 1020, 1026 (1978), compels the conclusion that the welding

rods at issue were not unreasonably dangerous.[14] However, Lincoln's and Hobart's assignment of error, as with their previous argument, is founded on their select version of the evidence viewed in a light most favorable to themselves. As previously noted, we may not review a denial of JNOV based upon the evidence viewed in the light most favorable to the verdict *loser. See Rohm and Haas, supra* at 472, 781 A.2d at 1176.

 ¶ 25 The question of whether an alleged defect renders a product "unreasonably dangerous" is one of law. Accordingly, the trial judge is required, prior to submitting the case to the jury, to "decide whether, under [the] plaintiff's averments of facts, recovery would be justified." *Phillips, supra* at 132 n. 5, 665 A.2d at 1171 n. 5 (quoting *Azzarello, supra* at 558, 391 A.2d at 1026). When arriving at its decision, the court acts "as both a social philosopher and a risk-utility economic analyst." *Riley v. Warren Manufacturing, Inc.,* 455 Pa.Super. 384, 688 A.2d 221, 224 (1997). A great many factors may be taken into account by the court in conducting its analysis, including,

> the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design.

*Id.* at 225 (quoting *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408, 423 n. 5 (1984), *abrogated on unrelated grounds as recognized by Moro-*

*ney v. General Motors Corp.,* 850 A.2d 629, 634–35 (Pa.Super.2004)). However, as this Court noted in *Dambacher, supra,*

> [a] risk/utility analysis is not well[-]suited to an inadequate warnings case, for in a warnings case, as distinguished from a defective design case, the utility of a product will remain constant whether or not a warning is added, but the risk will not.

*Id.* at 427 n. 7.

¶ 26 In their argument, Lincoln and Hobart fail to address the fact that the case *sub judice* is an inadequate warnings case. Rather, Lincoln and Hobart argue, on one side of the ledger, that welding rods (those containing asbestos *and those not*) have an indisputably tremendously high degree of utility, and on the other side of the ledger, that Lincoln's and Hobart's expert witnesses had proven that workers faced essentially no danger from working with the asbestos-containing welding rods. However, the jury clearly rejected the testimony of these witnesses, and thus Lincoln's and Hobart's experts did not prove that the welding rods were safe to use without adequate warning.

¶ 27 Lincoln and Hobart have failed to advance an argument that takes into consideration this Court's proper standard of review or the fact that Donoughe's action is based upon a failure to give adequate warnings rather than an allegedly defective design. Our independent review further shows that the record does not compel the conclusion that the trial court erred by denying Lincoln's and Hobart's motion for JNOV based on an *Azzarello* analysis.

---

**14.** The trial court did not explain the basis for its resolution of the *Azzarello* risk/utility analysis. Apparently for this reason, Lincoln and Hobart also argue that the trial court "disregarded" its duty to conduct the analysis. (Lincoln's and Hobart's Brief at 36). However, there is no basis in the record to support the rash allegation that the trial court disregarded its charge to conduct the *Azzarello* risk/utility analysis. Rather, the correct conclusion is that the trial court simply determined that the result of its analysis was contrary to Lincoln's and Hobart's position.

Accordingly, Lincoln's and Hobart's third issue is without merit.

### (c) Welding Slag

¶ 28 Lincoln's and Hobart's next assignment of error in the trial court's refusal to grant their motion for JNOV is that the trial court should not have allowed the jury to consider whether the generation of breathable dust from the scraping and brushing of slag from finished welds established or helped to establish the existence of a defective welding-rod "product." Lincoln and Hobart contend that while their welding rods are "products" for purposes of products liability litigation, slag, as a by-product from the use of the rods, was itself not a "product" for purposes of such litigation. In support of their argument, Lincoln and Hobart cite cases where a commercial oven not yet built on-site was determined not to be a "product;" where items whose useful life had ended and which were being demolished were determined not to be "products;" and where electricity is considered a "product" when it has been placed into the stream of commerce.[15]

¶ 29 However, while slag is not the "product" that Lincoln and Hobart initially manufactured, it is the expected and inevitable partial metamorphosis of the product that they did manufacture.[16] In this respect, the slag created following a weld is not appreciably different from the dried residue of liquid products, which, when the residue is brushed from clothes or tools, creates asbestos dust inhalable by the user. We have held that where a plaintiff produces evidence that the contracting of mesothelioma followed the breathing of dust containing asbestos, which in turn was caused by the brushing or abrasion of the dried residue of liquid pipe sealants applied in their liquid form, the plaintiff has created an issue of fact as to whether the inhalation of such dust caused the lung disease. *Harahan, supra,* 816 A.2d at 298, 300–01.

¶ 30 This Court's holding in *Harahan* is far more pertinent to the instant issue than any of the holdings in the cases cited by Lincoln and Hobart.[17] This is so because the factual relationship between welding rods and slag is similar to that of the substances involved in *Harahan*. Conversely, the cases cited by Lincoln and Hobart present factual scenarios completely dissimilar to the scenario in the case *sub judice*. Therefore, we conclude that Lincoln and Hobart are not entitled to judgment as a matter of law because the jury was allowed to consider evidence concerning the creation of breathable dust caused by the chipping or wire-brushing of slag, as slag is an intended metamorphosis of the product manufactured by Lincoln and Hobart. Accordingly, Lincoln's and Hobart's fourth issue is without merit.

### (3) Denial of Motion for New Trial

¶ 31 Lincoln's and Hobart's remaining three issues challenge the trial court's refusal to grant their motion for a new trial. Accordingly, we review these issues in light of the following principles:

> Trial courts have broad discretion to grant or deny a new trial. The grant of

---

**15.** Respectively, *Ettinger v. Triangle–Pacific Corp.,* 799 A.2d 95 (Pa.Super.2002); *Kalik v. Allis–Chalmers Corp.,* 658 F.Supp. 631 (W.D.Pa.1987); and *Schriner v. Pennsylvania Power & Light Co.,* 348 Pa.Super. 177, 501 A.2d 1128 (1985).

**16.** (*See, e.g.,* N.T. Trial, 4/27/05, at 17–21).

**17.** We also note that *Schriner,* which held that electricity is a product once it enters the stream of commerce and passes through the user's meter, does not appear to aid Lincoln's and Hobart's argument at all.

a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings. Although all new trial orders are subject to appellate review, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial.

\* \* \* \* \* \*

Each review of a challenge to a new trial order must begin with an analysis of the underlying conduct or omission by the trial court that formed the basis for the motion. There is a two-step process that a trial court must follow when responding to a request for new trial. First, the trial court must decide whether one or more mistakes occurred at trial. These mistakes might involve factual, legal, or discretionary matters. Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. The harmless error doctrine underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.

To review the two-step process of the trial court for granting or denying a new trial, the appellate court must also undertake a dual-pronged analysis. A review of a denial of a new trial requires the same analysis as a review of a grant.

\* \* \* \* \* \*

The appropriate standard of review [ ] controls [the appellate court's] initial layer of analysis. If the [alleged trial court] mistake involved a discretionary act, the appellate court will review for an abuse of discretion. ... ( [*e.g.*,] decision whether verdict is against weight of evidence is discretionary). If the mistake concerned an error of law, the court will scrutinize for legal error. ... ( [*e.g.*,] propriety of jury instructions entails question of law).

\* \* \* \* \* \*

[If the appellate court determines that the trial court abused its discretion or committed an error of law, it proceeds to the second layer of analysis.] The appellate court must then determine whether the trial court abused its discretion in ruling on the request for a new trial. Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion.

\* \* \* \* \* \*

[Where, as here, the trial court does not set forth its reasons for denying a motion for a new trial, or] where the trial court leaves open the possibility that there were reasons to grant or deny a new trial other than those it expressly offered, ... an appellate court must apply a broad scope of review and affirm if it can glean any valid reason from the record.

*Harman ex rel. Harman v. Borah,* 562 Pa. 455, 465–69, 756 A.2d 1116, 1121–24 (2000) (citations and quotation marks omitted).

### (a) "Trial by Ambush"

¶ 32 Lincoln and Hobart first argue that because of Donoughe's alleged violations of the Rules of Civil Procedure and of the trial court's case management order during the discovery phase of trial and the trial court's subsequent erroneous evidentiary rulings, Lincoln and Hobart were unprepared to mount an effective defense and were required to endure, in their parlance, a "trial by ambush." (Lincoln's and Hobart's Brief at 49). More specifically, Lincoln and Hobart contend that Donoughe failed to timely provide to them information concerning the factual basis of his claim against them and the evidence to be brought at trial. They allege that Donoughe first offered this information "weeks" prior to trial in an answer to Lincoln's and Hobart's motion for summary judgment. (*Id.* at 44). Moreover, they contend that Donoughe never supplied an expert report prepared by Dr. Epstein. For these reasons, Lincoln and Hobart argue that the trial court erred by denying their motion for a new trial.

¶ 33 Lincoln and Hobart were not originally named in Donoughe's complaint. At his May 19–20, 2004 deposition, Donoughe testified that he had worked with asbestos-containing welding rods manufactured by Lincoln. Subsequently, Donoughe asserted that he had also worked with asbestos-containing welding rods manufactured by Hobart; and thereafter he obtained the trial court's permission to amend the complaint to add Lincoln and Hobart as defendants. The amended complaint was filed and served upon Lincoln and Hobart on or

about July 6, 2004. Trial in this matter commenced in early April 2005, approximately nine months after the service of the complaint upon Lincoln and Hobart.

¶ 34 In their argument, Lincoln and Hobart allege that they had only two weeks to prepare for trial, while Donoughe "had the luxury of eight full months in which to prepare. . . ." (*Id.* at 48). This allegation is based upon the fact that their motion for summary judgment was denied two weeks prior to trial, and that they had expected the trial court to grant their motion and dismiss the allegations against them. In the face of the denial of their motion for summary judgment, Lincoln and Hobart *then* elected to depose Donoughe and *then* elected to secure the services of Dr. Hughson as an expert witness, who happened to be unavailable.[18] (*See Id.* at 47–49).

■ ¶ 35 Quite simply, Lincoln's and Hobart's trial strategy of doing nothing in preparation for trial for nearly eight months, based upon an anticipated victory on their summary judgment motion, does not lend support to their claim that they had been "ambushed" in this litigation. Thus, we are not persuaded that the trial court abused its discretion by admitting Donoughe's evidence against Lincoln and Hobart. Further, *even if we were* to conclude that the trial court had abused its discretion by admitting the challenged evidence, we could not conclude that the trial court abused its discretion by refusing Lincoln's and Hobart's motion for a new trial, as these parties failed to credibly show how they had been prejudiced by the trial court's evidentiary rulings. *See Harman, supra* at 467, 756 A.2d at 1122 ("A new trial is not warranted merely because some irregularity occurred during the trial

---

**18.** Because Dr. Hughson was unavailable, Lincoln and Hobart, over Donoughe's objection, read into evidence the trial testimony of Dr. Hughson from an earlier welding-rod asbestos case involving a different plaintiff.

or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.").

¶ 36 The only specific assertion that Lincoln and Hobart provide regarding their alleged prejudice is that Dr. Hughson was unavailable to testify at trial, and that the reading of Dr. Hughson's previous testimony to the jury lacked the impact of a live presentation. (Lincoln's and Hobart's Brief at 47–48). However, Lincoln and Hobart only acted to secure Dr. Hughson's services *after* their motion for summary judgment had been denied. (*Id.*) Therefore, Lincoln's and Hobart's failure to timely obtain this witness is attributable *to them*, not to Donoughe or the trial court. Further, Lincoln and Hobart had obtained a "substitute" expert witness for Dr. Hughson, who then became unavailable because of a sudden family emergency. (*See* Lincoln's and Hobart's Brief at 48). Clearly, this witness's unavailability could not be charged to Donoughe or the trial court either. Thus, Lincoln's and Hobart's contention that they were prejudiced with respect to their presentation of expert testimony is without merit.

¶ 37 With respect to Donoughe's evidence that he had inhaled asbestos fibers from Lincoln's and Hobart's products, we note that Lincoln and Hobart fail to allege that they did not possess Donoughe's original deposition in which he testified that he had worked with No. 6011 welding rods, particularly Lincoln's, and had inhaled the dust that was shed by them. Second, the evidence that these rods were coated with asbestos came from *Lincoln's and Hobart's own documents and witnesses.* Therefore, Lincoln and Hobart have failed to establish any prejudice regarding this evidence.

¶ 38 Turning to Lincoln's and Hobart's allegation that they never received an expert report prepared by Dr. Epstein, we observe first that Lincoln and Hobart fail to assert how exactly they were prejudiced as a result of this omission. Second, we note that the record thoroughly establishes that Lincoln and Hobart suffered absolutely no prejudice whatsoever. As the trial court noted on the record, Lincoln and Hobart, their counsel, and Donoughe's counsel were not unfamiliar with the expert evidence supporting claims involving the dangers of breathing in asbestos fibers shed by welding rods, as these parties and individuals had been involved in previous welding-rod asbestos litigation.[19] Indeed, Dr. Epstein's testimony as to the effect of each exposure to asbestos fibers is well-known from asbestos litigation dating back many years. *See, e.g., Lonasco v. A–Best Products Co.,* 757 A.2d 367, 375 (Pa.Super.2000) (discussing Dr. Epstein's testimony in a 1995–1996 asbestos trial before a Philadelphia common pleas court).

¶ 39 Undoubtedly for this reason, the record in the case *sub judice* shows that Lincoln and Hobart were fully prepared to cross-examine Dr. Epstein on his Phase II testimony and did so in an expert manner. In one significant example from Lincoln's and Hobart's expert and well-prepared cross-examination, Lincoln and Hobart were able to challenge Dr. Epstein with the transcribed testimony he delivered in *another asbestos case.* (*See* Dr. Epstein's Trial Deposition, 4/25/05, at 26–27). Further, Lincoln's and Hobart's cross-examination of Dr. Epstein yielded evidence that the doctor is not an expert on welding,

---

19. (*See* N.T. Trial, 5/2/05, at 48–49, wherein the trial court relevantly stated, as the basis for its denial of Lincoln's and Hobart's motion to exclude the testimony of Dr. Epstein from Phase II of the trial: "I don't think anybody is really surprised [by] what [Dr. Epstein] is going to say [or] caught off guard [by the doctor's testimony].").

metallurgy, or industrial hygiene, all facts which formed the basis of several of Lincoln's and Hobart's arguments in this appeal. Finally, the significant substance of Dr. Epstein's testimony was not different from that given by Dr. Spector in Phase I of the trial, and there is no dispute that Lincoln and Hobart had been provided with Dr. Spector's expert report. Accordingly, Lincoln's and Hobart's argument that they had been prejudiced with respect to Dr. Epstein's testimony during Phase II of the trial is wholly without merit.[20]

¶ 40 For all of the above reasons, we have no hesitation concluding that the trial court did not abuse its discretion by denying Lincoln's and Hobart's motion for a new trial based on the argument that they were "ambushed" and ill-prepared to go to trial as a result of Donoughe's alleged pretrial behavior.

### (b) Reverse–Bifurcated Trial

¶ 41 Lincoln and Hobart next argue that the trial court abused its discretion by failing to sustain their objection to the court's trying the matter by reverse bifurcation. Reverse bifurcation is "the practice for most asbestos cases" where "issues of medical causation and damages [Phase I] are tried before issues involving theories of liability and product identification [Phase II]." *Fritz v. Wright*, 589 Pa. 219, 239 n. 10, 907 A.2d 1083, 1095 n. 10 (2006). Lincoln and Hobart contend that this long-standing practice, noted with equanimity by our Supreme Court in *Fritz*, "is an innately prejudicial procedure because it forces a jury to form preconceptions about liability before hearing key

evidence. It is especially prejudicial for defendants such as Lincoln and Hobart, whose products, because of their chemical composition, could not release asbestos in respirable form." (Lincoln's and Hobart's Brief at 50).

¶ 42 Despite devoting seven pages of their brief to this issue, Lincoln and Hobart fail to present a persuasive, supported analysis establishing their hyperbolic contentions. Lincoln's and Hobart's main argument is that during Phase I, the jury received evidence that Lincoln's and Hobart's products shed asbestos fibers that Donoughe inhaled, but that Lincoln and Hobart could not present rebuttal evidence at that time. (*Id.*) They assert that because of this circumstance, the jury had already reached its conclusion as to Lincoln's and Hobart's *liability* by the conclusion of Phase I. However, this is a wholly unsubstantiated allegation that is not deducible from anything of record. Moreover, Lincoln and Hobart were fully able to present their evidence during Phase II, following Donoughe's more detailed evidence of exposure to asbestos shed from their products. Phase II was when the jury was asked to determine which, if any, of the many defendants were liable for Donoughe's asbestos-related injuries established during Phase I. Thus, there is simply no basis to conclude that Lincoln's and Hobart's defense was hampered or prejudiced by being raised at the liability stage of the proceedings any more than if the trial had not been bifurcated. The parties participated in a *single* bifurcated trial, not two trials where Lincoln and Hobart were found liable each time.[21]

---

20. Dr. Epstein had testified during Phase I of the trial for another plaintiff who was asserting claims similar to those of Donoughe's. The two cases were tried together, and Dr. Epstein's Phase II testimony was on behalf of this other plaintiff as well as Donoughe.

21. Lincoln and Hobart also argue that the reverse bifurcated trial violated their constitutional rights to due process and a fair jury trial. (Lincoln's and Hobart's Brief at 51–52). This argument is based on the allegation that they were deprived of an "opportunity to be heard." (*Id.* at 52). This argument is plainly,

¶ 43 A trial court's decision to bifurcate a trial is made in its discretion. *Santarlas v. Leaseway Motorcar Transport Co.*, 456 Pa.Super. 34, 689 A.2d 311, 314 (1997). Having concluded that the trial court did not abuse its discretion when it overruled Lincoln's and Hobart's objection to a reverse bifurcated trial, we determine that Lincoln's and Hobart's argument is without merit.

### (c) Dr. Epstein's Testimony

¶ 44 Finally, Lincoln and Hobart argue that the trial court abused its discretion by permitting Dr. Epstein to testify regarding the effect of Donoughe's inhalation of asbestos dust shed by welding rods.[22] Lincoln and Hobart renew their argument that Dr. Epstein should not have been permitted to testify at all because of Donoughe's failure to supply an expert report (an argument that we have already rejected), but devote the bulk of their argument to the contention that Dr. Epstein was not qualified to testify as an expert because, by his own admission, he lacked expertise in the chemical composition of welding rods and flux and was not an expert in welding.

¶ 45 Lincoln's and Hobart's argument is a red herring. Dr. Epstein is a pulmonologist and an expert on the effects of the inhalation of asbestos fibers into the lungs.

He testified to the effects of Donoughe's inhalation of asbestos fibers shed from Lincoln's and Hobart's products. This was a matter within his expertise. Accordingly, we unhesitatingly conclude that the trial court did not abuse its discretion in certifying Dr. Epstein as an expert on the matters about which he testified.[23]

¶ 46 For all of the above reasons, we conclude that the trial court neither erred nor abused its discretion when it denied Lincoln's and Hobart's motions for JNOV and for a new trial.

### Donoughe's Issue

¶ 47 Donoughe presents a single issue on appeal: whether the trial court erred when it denied Donoughe's motion to mold the verdict "to address the shortfall between the amount paid by Johns–Manville Corporation ["Manville"] pursuant to its *pro tanto* release with [Donoughe] and the *pro rata* share allocated Manville by the verdict." (Donoughe's Cross–Appellants' Brief at 2).

¶ 48 The background for this argument is as follows. Donoughe obtained a verdict against eleven asbestos defendants in the amount of $360,000 for John Donoughe and $36,000 for Helen Donoughe, for a total of $396,000, plus post-verdict interest. Thus, the *pro rata* share of each defendant is approximately $36,000, plus

wholly, and indisputably without merit. We note further that a part of Lincoln's and Hobart's argument is based upon evidence that the jury had rejected, *i.e.*, that Lincoln's and Hobart's welding rods were completely harmless. (*See id.* at 50).

22. Lincoln and Hobart also devote approximately six pages of their brief to an argument that the trial court abused its discretion by allowing Donoughe to testify that he had observed dust when handling and working with the welding rods when Donoughe lacked the expertise to conclude that the dust contained asbestos. (*See* Lincoln's and Hobart's Brief at 56–61). However, Lincoln and Hobart never

set forth this argument in their Statement of Questions Involved. Accordingly, we deem it waived. *See* Pa.R.A.P. 2116(a); *Lackner v. Glosser*, 892 A.2d 21, 29 (Pa.Super.2006). Moreover, this issue essentially mirrors arguments contained in Lincoln's and Hobart's first substantive issue, which we have already determined to be meritless.

23. Moreover, we note that Lincoln's and Hobart's cross-examination of Dr. Epstein established to the jury that the doctor was not an expert on welding, metallurgy, or the chemical composition of welding rods or flux.

post-verdict interest. Donoughe asserts that at some unspecified date he had settled with the Manville Trust, established to address claims brought against the bankrupt Manville, for $4,500, obtaining a *pro tanto* release. Because the Manville settlement left a shortfall of approximately $31,500 for Manville's *pro rata* share of the verdict, Donoughe contends that this shortfall must be satisfied by the non-settling defendants, namely Lincoln and Hobart, pursuant to the *pro tanto* release.[24] Donoughe contends that this result is mandated by *Baker v. ACandS*, 562 Pa. 290, 755 A.2d 664 (2000), and that the trial court erred by refusing to follow the Supreme Court's *Baker* analysis.

¶ 49 The trial court's rationale for denying Donoughe's motion to mold the verdict was that Donoughe had failed to submit to the court documents regarding the terms of the settlement with the Manville Trust. The trial court noted that Donoughe "failed to provide the Court with the necessary tools to effectuate meaningful review," and for this reason the court deemed it improper to grant Donoughe's motion. (Trial Court Opinion, reviewing Donoughe's issue, at 8–9). Ordinarily, when a party fails to submit to the court the documentation supporting a prayer for relief, we are inclined to affirm the court's decision to deny relief. However, we have quite plainly held that because the terms of settlement with the Manville Trust are fixed by a Trust Distribution Process, a trial court is required to apply these terms to a motion to mold the verdict, despite the absence of evidence re-

garding the final terms of settlement. *Andaloro v. Armstrong World Industries, Inc.*, 799 A.2d 71, 79–82 (Pa.Super.2002). Further, any manner of set-off against the non-settling tortfeasors must conform to the provisions of the Uniform Contribution Among Tort-feasors Act, 42 Pa.C.S.A. §§ 8321–27 ("UCATA"), which did not occur in the case *sub judice*. *See Baker, supra* at 296–98, 755 A.2d at 667–68. Therefore, we conclude that Donoughe's argument has merit.

¶ 50 Preliminarily, we note that questions regarding the apportionment of liability between or among joint tortfeasors are ones of law. For this reason, our scope of review is plenary, and our standard of review is limited to whether the trial court committed an error of law or an abuse of discretion. *Andaloro, supra* at 78.

¶ 51 In *Andaloro*, this Court addressed the question of whether the trial court erred by assigning a *pro rata* verdict share to Manville (which was the practical result of the trial court's ruling in the case *sub judice*) where the plaintiff's claim against the Manville Trust had not yet been resolved as to dollar amount and where the trial court concluded that it had to guess as to whether the release and settlement would be *pro rata* or *pro tanto*. *See id.* at 79. Thus, the question presented in *Andaloro*, is applicable to that in the case *sub judice*, where Donoughe **had** resolved his claims against the Manville Trust, but simply neglected to attach the settlement terms to his motion to mold the verdict.

---

24. As our Supreme Court explained:

Where a plaintiff and settling defendant sign a *pro tanto* release, then the plaintiff's ultimate recovery against the nonsettling joint tortfeasors is the total award of damages reduced by the amount of consideration paid for the release. In contrast, if the parties sign a *pro rata* release (which is also known as an "apportioned share set-off" release), then the plaintiff's ultimate recovery against the nonsettling tortfeasors is the total award of damages reduced by the settling party's allocated share of liability.

*Baker v. ACandS*, 562 Pa. 290, 293 n. 1, 755 A.2d 664, 666 n. 1 (2000).

¶ 52 Citing *Baker, supra,* we initially noted in *Andaloro* the general law of settlement and set-off in this Commonwealth:

As a general matter, the law of Pennsylvania provides that joint tortfeasors are jointly and severally liable to the plaintiff to pay awards of damages arising out of the injury to which their activity contributed. Our Supreme Court has determined, however, that when a plaintiff settles his or her claim with the Manville Trust, the terms of the settlement release govern the allocation of liability between the remaining defendants. Accordingly, the release also determines the amount of the set-off against liability to which the remaining defendants are entitled due to the Trust's participation. If a plaintiff's agreement with the Trust provides that the setoff shall be *pro rata,* then a full equal share is deducted from the amount of the verdict for which the remaining defendants may be held accountable. One full share of equal value shall be assessed against each party, including the Trust, and the full value of the Trust's share shall be deducted from the verdict. Even if, as is customary, the amount paid by the Trust is markedly less than the value of a full *pro rata* share, the remaining defendants are entitled to offset the value of a full share against the verdict amount. The defendants are thus accorded a reduction in their respective contributions based on the share attributed to the Trust regardless of whether the Trust paid the value of a full share in settlement. The plaintiff may not recover the shortfall in the Trust's payoff from the remaining defendants.

If, however, the release is designated *pro tanto,* any subsequent verdict shall be reduced only by the *actual amount paid* by the Trust and the remaining amount of the verdict divided equally between the defendants held liable. Apportionment of the verdict, *pro tanto,* thus enables the plaintiff to collect the entire amount of the verdict, notwithstanding the lesser value of the Trust's contribution, as the amount exceeding that contribution is apportioned equally [among] the remaining defendants. In this manner, a settling plaintiff is assured recovery of the full amount of the verdict regardless of the lesser amount paid by the Trust. The remaining defendants are then subject to a greater proportionate share of liability, which they may not recover from the Trust.

*Andaloro, supra* at 78–79 (citations omitted; emphasis in original).

¶ 53 We then noted that the Trust Distribution Process "provides a specific formula to determine the amount of a set-off attributable to the participation of the Manville Trust in the absence of a settlement agreement." [25] *Id.* at 79. Reviewing the Trust Distribution Process further, together with applicable provisions of the UCATA, we determined that the Trust's "set-off amounts are properly applied to the verdict *pro tanto* when factoring the contribution amounts from the defendants found liable at trial." *Id.* at 80. This latter determination was based upon several factors.

¶ 54 First, the Trust Distribution Process provides, with respect to Pennsylvania claims and those from a number of other states, that the law of the state would determine whether the settlement release would be *pro tanto* or *pro rata.* Second, Pennsylvania law, pursuant to Section 8326 of the UCATA, 42 Pa.C.S.A. § 8326, and

---

**25.** For this reason, we determined that the trial court erred when it failed to calculate the value of the Manville Trust's settlement contribution. *Id.* at 80, 82.

as interpreted by our Supreme Court in *Baker,* relevantly provides that a release to one tortfeasor reduces the claim against other tortfeasors **in the amount of the consideration paid for the release** (thus, a *pro tanto* release) **or** in any amount or proportion greater than the consideration paid **if** provided for in the release. Thus, contrary to the trial court's disposition in the case *sub judice,* the default is to a *pro tanto* not a *pro rata* disposition if the release is silent. Third, Pennsylvania law reflects a "commitment, often reaffirmed in the decisions of our appellate courts[,] that [a] plaintiff should be fully compensated for his injuries," which requires, absent an agreement to the contrary, that settlement releases be *pro tanto. Andaloro, supra* at 81 (quotation marks and citation omitted); *see also Baker, supra* at 296–302, 755 A.2d at 667–70. As we concluded in *Andaloro,* relevant to the matter in the case *sub judice:*

> Were we to affirm the trial court's *pro rata* set-off of the Manville Trust's liability, we would effectively deprive the injured [p]laintiffs of their right to compensation in the interest of enforcing the rights of defendant tortfeasors to limit their liability to a stated share of the verdict. The plaintiffs would collect markedly less compensation while the defendants would experience a windfall in the form of a reduction in liability. Such a result is openly hostile to the stated objectives of joint and several liability as a system of compensation. A non-settling joint tortfeasor should not receive a release of its joint and several liability to the plaintiff simply because another joint tortfeasor settled for less than his or her allocated share of liability. We conclude[,] accordingly[,] that where the Manville Trust has not settled a plaintiff's claim prior to entry of a verdict against other joint tortfeasors, the value of the set-off available to the joint tortfeasors based on the Trust's unliquidated contribution, shall be calculated under the [ ] provisions of the [Trust Distribution Process] and applied to the verdict *pro tanto.* As the trial court in this matter declined to calculate the value of the Trust's unliquidated contribution and applied a *pro rata* set-off, we conclude that the court erred. Accordingly, we vacate the judgment and remand the matter for redetermination of the appropriate set-off.

*Andaloro, supra* at 82 (citations, quotation marks, and parentheses omitted).

■■■ ¶ 55 Turning to the case sub judice, we apply the analysis and holding of *Andaloro* to conclude that the trial court herein erred by effectively applying a pro rata set-off for Donoughe's settlement with the Manville Trust when it denied Donoughe's motion to mold the verdict to reflect a pro tanto release. *Baker* and *Andaloro* plainly provide that absent a stated intention to the contrary, a release of one joint tortfeasor is to be applied pro tanto to the remaining tortfeasors. *Andaloro* establishes that the Manville Trust Distribution Process treats Pennsylvania claim releases in accordance with Pennsylvania law, and that a trial court may take cognizance of this fact, **even when the Trust has not yet settled the claim.** Here, rather than effectively treat Donoughe's Manville Trust release as pro rata, and thus subvert the basic legal principle in this Commonwealth that plaintiffs are to be made whole, the trial court could have simply followed our holding in *Andaloro* and/or requested for its review a copy of the release from the Manville settlement, to ensure that the release comports with the recognized practice of providing for *pro tanto* treatment. It will now have that opportunity.

¶ 56 Accordingly, because the trial court erred by not following the guidance pro-

vided by *Baker* and *Andaloro,* we vacate the judgment and remand this matter for a redetermination of the appropriate set-off with respect to the Manville Trust settlement.

¶ 57 Having determined that none of Lincoln's and Hobart's claims on appeal have any merit, we conclude that the trial court correctly denied their motions for JNOV and for a new trial. However, having also determined that Donoughe's claim on appeal does have merit, we vacate the judgment of the trial court and remand for a redetermination of the appropriate set-off with respect to the Manville Trust settlement.

¶ 58 Judgment affirmed in part, vacated in part, and remanded for further proceedings. Jurisdiction relinquished.