J-E02002-14

2014 PA Super 286

| | |
|---|---|
| DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| AIRCO WELDERS SUPPLY, ALLIED SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO., EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION, GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL | |

INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

APPEAL OF:  CRANE CO.

No. 865 EDA 2011

Appeal from the Judgment Entered February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 1335 Dec. Term 2008

DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON

v.

AIRCO WELDERS SUPPLY, ALLIED SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT

IN THE SUPERIOR COURT OF
PENNSYLVANIA

2

CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO., EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION, GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

APPEAL OF:  HOBART BROTHERS CO. | No. 866 EDA 2011

Appeal from the Judgment Entered February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 1335 Dec. Term 2008

DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON | IN THE SUPERIOR COURT OF PENNSYLVANIA

v.

AIRCO WELDERS SUPPLY, ALLIED

SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO., EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION, GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION

4

CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

APPEAL OF: LINCOLN ELECTRIC CO.    No. 867 EDA 2011

Appeal from the Judgment Entered February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 1335 Dec. Term 2008

DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON, AND IN HER OWN RIGHT,

IN THE SUPERIOR COURT OF PENNSYLVANIA

APPELLANT

v.

AIRCO WELDERS SUPPLY, ALLIED SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO., EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION,

5

GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

No. 889 EDA 2011

Appeal from the Judgment Entered February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 1335 Dec. Term 2008

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, J., SHOGAN, J., ALLEN, J., OTT, J., WECHT, J., STABILE, J., AND JENKINS, J.

OPINION BY BENDER, P.J.E.:              **FILED DECEMBER 23, 2014**

In this asbestos action, the parties appeal from the judgment entered in Philadelphia County Court of Common Pleas in favor of Darlene Nelson, both individually and as Executrix of the Estate of James Nelson, in the amount of $14.5 million.  Appellants/Cross Appellees consist of Crane Co.,

6

Hobart Brothers Company, and Lincoln Electric Company (hereinafter, the latter two will be referred to as "the Welding Companies"). Darlene Nelson cross-appeals solely in her capacity as executrix. We vacate and remand for a new trial consistent with the following opinion.

James Nelson developed mesothelioma, allegedly the result of occupational exposures to various asbestos products during his career at Lukens Steel Plant in Coatesville, Pennsylvania.[1] He worked in several capacities while employed at Lukens Steel. From 1973 until approximately the end of 1978, James Nelson worked as a pitman, machinist's helper, and laborer. Thereafter, he worked as a welder from early 1979 until he left Lukens Steel in 2006. After leaving Lukens Steel, he worked at Claymont Steel as a maintenance mechanic until he was diagnosed with mesothelioma in November 2008. James Nelson died in October 2009.

James Nelson and Darlene Nelson commenced this product liability action in December 2008. Following James Nelson's death, Darlene Nelson was substituted as executrix. The Nelson case was consolidated with four

---

[1] The record in this case is voluminous, consisting of thousands of pages of testimony and argument, and hundreds of pages of briefs submitted to this Court. We have reviewed it thoroughly. In light of our disposition, however, we will limit our discussion of the facts and procedure in a manner sufficient to address the issues before us. As is readily apparent from the caption of this case, Nelson initiated this suit against dozens of named defendants. However, for various reasons not relevant to this appeal, only Appellants remained at the close of trial.

other actions in which plaintiffs had contracted mesothelioma, and trial commenced in March 2010.[2] As was common practice in Philadelphia County at the time, the Court of Common Pleas determined to proceed with a reverse bifurcated trial, over the objections of the Appellants.[3]

It was undisputed that Nelson was exposed to respirable asbestos fibers during his career at Lukens Steel. During the first several years of his employment, Nelson worked with and around significant quantities of asbestos insulation. *See, e.g.*, Nelson Video Deposition, 03/06/2009, at 21-25 (describing the general work environment in the open hearth and electric furnace areas of the steel plant and testifying that asbestos insulation dust fell constantly from thousands of feet of steam piping with such intensity that "[y]ou could hardly see in them buildings").

Nelson also described his exposure to Appellants' products. According to Nelson, the "flux," or outer coating, of welding rods used by him on a daily basis would release dust when he removed them from a box or otherwise manipulated them. Nelson used many different types of rods, depending on availability and the type of job performed. It was

---

[2] Hereinafter, for convenience, we will refer to James Nelson and Darlene Nelson, individually and as executrix of her husband's estate, as "Nelson," unless it is necessary to distinguish between them.

[3] Our review will proceed in a more traditional manner, discussing first liability and then damages.

acknowledged by the Welding Companies that certain rods manufactured by Hobart and Lincoln contained encapsulated asbestos fibers until approximately 1981. Nelson testified that airborne dust was visible, that it would get on his work gloves, and that he inhaled the dust. *Id.* at 76-80.

While welding, Nelson also used a Crane Co. product known as "Cranite," a sheet gasket made of chrysotile asbestos. *See, e.g.*, Notes of Testimony, 03/17/2010, at 65-66. Nelson used Cranite for two "shielding" purposes, either to protect plant equipment from overspray during spray welding or to protect other workers from the flash of the welding arc. *See* Nelson Video Deposition, 03/13/2009, at 187-89, 197-98. As needed, Nelson used a utility knife to cut the Cranite sheet into a size useful for his purposes, releasing visible dust into his work environment. *Id.* at 198-99.

In order to establish that Appellants' products were a substantial factor in causing Nelson's mesothelioma, Nelson introduced the expert testimony of pulmonologist, Dr. Daniel DuPont. Dr. DuPont was Nelson's sole causation witness during the liability phase of the trial. According to Dr. DuPont, "[m]alignant mesothelioma occurs with significant asbestos exposure," which he defined as "[t]he inhalation of fibers above the negligible amount

already contained in the environment." DuPont Video Deposition, 03/11/2010, at 32, 50.[4]

Dr. DuPont acknowledged that he was not an expert in Appellants' products and could not opine whether the products actually released respirable asbestos fibers. *See, e.g.*, *id.* at 23, 25, 81-82, 88-89, 121-122, and 164. No evidence was introduced by Nelson to establish such release. Nevertheless, in response to hypothetical questions crafted by counsel, in which Dr. DuPont was asked to *assume* that any visible dust released by Appellants' products contained respirable asbestos fibers, Dr. DuPont concluded that Nelson's exposure to these products constituted a substantial, contributing factor in causing his disease. *See id.* at 58-62.

In response, Appellants challenged Nelson's contention that use of their products resulted in significant exposure to asbestos. For example, among the several expert witnesses to testify on behalf of the Welding

---

[4] Appellants filed motions seeking to preclude Dr. DuPont from testifying. According to Appellants, Dr. DuPont premised his opinions on the so-called "any-exposure" theory of causation. Appellants asserted that such testimony was devoid of scientific support and impermissible under Pennsylvania law, citing in support *Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216 (Pa. 2007). In the alternative, Appellants requested a *Frye* hearing, asserting Dr. DuPont's methodology was novel. *See Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923). After substantial argument, the trial court denied Appellants' motions. *See* N.T., 3/1/2010, at 28-57; N.T., 3/9/2010 a.m., at 109-17; N.T., 3/9/2010 p.m., at 36-79.

Companies, Dr. John DuPont,[5] a professor of materials science, explained how asbestos-containing welding rods were manufactured and consumed by the welding process. **See** N.T., 03/15/2010, at 66-75 (describing how asbestos was encapsulated in "wet" sodium silicate and baked to produce a ceramic-like material incapable of releasing asbestos fibers), 80-83 (explaining that the temperature of the welding arc is above 10,000 degrees Fahrenheit, whereas steel melts at 2,700 degrees, sodium silicate melts at about 1,650 degrees, and chrysotile asbestos fibers are destroyed at 1,500 degrees). Prof. DuPont concluded that it was *scientifically impossible* for asbestos fibers to be released from an encapsulated flux and that the temperatures involved in the welding process destroyed the encapsulated fibers. **Id.** at 93.

The Welding Companies also presented expert testimony from Dr. Mary Finn and Dr. Louis Burgher, who each testified, in part, to the absence of an epidemiological association between the use of welding sticks and mesothelioma. **See** N.T., 03/15/2010, at 59; N.T., 03/16/2010, at 27-31. Nelson presented no testimony disputing this evidence. **See, e.g.**, DuPont Video Deposition, at 82, 88-89.

_____

[5] John DuPont is the brother of plaintiff's expert, Daniel DuPont. We will refer to John DuPont as "Prof. DuPont."

For its part, Crane Co. focused on the form of asbestos fibers contained in its product and the extent of Nelson's exposure to it, particularly in light of his cumulative exposure to numerous products over his career at Lukens Steel. For example, forensic pathologist Dr. Michael Graham distinguished several different types of asbestos fibers, including crocidolite, amosite, and chrysotile fibers, suggesting that the latter represented the least toxic form of asbestos. *See* N.T., 03/11/2010, at 92-98.[6] Dr. Graham concluded that Nelson's disease was caused by his substantial exposure to highly toxic, asbestos insulation products and not exposure to Cranite sheet gasket. *Id.* at 142.

In addition, Mr. Charles Blake, an industrial hygienist, testified on behalf of Crane Co. Mr. Blake testified that Cranite sheets contained compressed chrysotile fibers that could not be released merely by handling the product or using it as a free-standing shield and that Nelson's infrequent cutting of the sheets would not release asbestos fibers in quantities sufficient to create any significant risk. N.T., 03/17/2010, at 70-72. Mr. Blake similarly concluded that Nelson's mesothelioma was the result of significant exposure to amosite asbestos insulation and that his exposure to Cranite was "not at all" a significant source of exposure. N.T., 03/17/2010, at 74.

_____

[6] Cranite sheet gasket contained chrysotile asbestos. *See supra*.

Crane Co. also sought to challenge the manner in which Nelson used its product, soliciting testimony that the intended use of Cranite sheet gaskets was to "produce gaskets for sealing [] fluid systems," and not as a welding shield. N.T., 03/17/2010, at 66. Nevertheless, Crane Co.'s proffer of additional testimony to establish that Nelson's use of Cranite was improper was denied by the trial court. **See** N.T., 03/18/2010, 8-10; **see also** N.T., 03/09/2010, at 95 (denying Crane Co.'s motion *in limine* regarding unintended use of Cranite).[7]

At the close of the liability phase of the trial, the jury found Appellants' products defective and that the products lacked any warning sufficient to make them safe for use, thus imposing strict liability. During closing arguments in the damages phase of the trial, Appellants objected to certain remarks made by Nelson's counsel on the ground that counsel had improperly suggested to the jury a specific dollar amount for non-economic damages. **See** N.T., 03/08/2010, 80-83. Appellants sought a mistrial, which was denied by the trial court. **See id.** at 97. Thereafter, the jury returned a verdict in favor of Nelson, awarding $1 million in stipulated, economic damages to the estate, $1.5 million to Darlene Nelson for loss of consortium, $7 million in non-economic damages pursuant to the Survival

---

[7] The trial court also declined Crane Co.'s motions for nonsuit and directed verdict, denied Crane Co.'s request for jury instruction, and declined their motions for JNOV or a new trial based on the intended use doctrine.

Act and $5 million in non-economic damages pursuant to the Wrongful Death Act. *See* 42 Pa.C.S. §§ 8301 (defining wrongful death action), 8302 (defining survival action).

All parties filed post-trial motions, which were denied by the trial court. The Welding Companies and Crane Co. appealed; Nelson cross-appealed. The parties submitted court-ordered Pa.R.A.P. 1925(b) statements, and the trial court issued a responsive opinion.

The Welding Companies present the following issues for our review, concisely restated as follows:

1. Whether the trial court erred in permitting Nelson's expert, Dr. Daniel DuPont, to testify premised upon the "any-exposure" theory of causation;

2. Whether the court erred in holding that Nelson proffered sufficient evidence to prove exposure to respirable asbestos fibers released from their products;

3. Whether the court erred in denying a mistrial or not granting a new trial where counsel for Nelson (1) improperly suggested a specific amount of non-economic damages; (2) injected alleged settlement discussions in his closing argument; (3) attributed bad motives to the Welding Companies; and (4) further injected conduct and punitive elements into a strict liability case; and

4. Whether the court erred in permitting reverse bifurcation and consolidation of four unrelated mesothelioma cases.

*See* Welding Companies' Substitute *En Banc* Brief, at 7-8.

Crane Co. presents the following issues:

1. Whether the court erred in holding that Crane Co. could be held strictly liable where Nelson was neither an intended user of

its product nor did Nelson use its product in an intended manner;

2. Whether Nelson's expert witness offered legally sufficient causation testimony, in that it was premised upon an "any-exposure" theory of causation;

3. Whether Nelson's evidence was sufficient to meet the requirements of the "frequency, regularity, and proximity" test;

4. Whether the court erred in conducting a consolidated and reverse bifurcated trial;

5. Whether the court erred in permitting counsel for Nelson to suggest a specific amount of non-economic damages or to discuss the conduct of a defendant in a claim for strict liability;

6. Whether a plaintiff may recover all of the jury-awarded damages from solvent defendants, and then recover additional amounts, based upon the same injury, from "asbestos bankruptcy trusts."

*See* Crane Co. Refiled Original Brief, at 4-5.

Finally, Nelson presents the following issue:

1. Whether the court erred "in assigning a share of the judgment to a defendant who, although adjudged a joint tortfeasor by the jury, filed a bankruptcy petition before paying plaintiff any of the agreed-upon settlement amount and before the court entered a judgment."

Nelson's Substituted Brief (filed in response to Welding Companies' appeal), at 4; *see also* Nelson's Substituted Brief (filed in response to Crane Co.'s appeal), at 5.[8]

_____

[8] In light of our disposition, the parties' claims regarding recovery of damages are moot. We will not address them.
*(Footnote Continued Next Page)*

15

Appellants raise several challenges to the sufficiency of Nelson's liability evidence. We will first address Appellants' assertions regarding Nelson's expert testimony.[9]  As noted previously, Nelson introduced testimony from Dr. Daniel DuPont in order to establish that Appellants' products were a substantial cause of Nelson's mesothelioma.  According to Appellants, Dr. DuPont proffered an "any-exposure" theory of causation. Appellants assert that the Pennsylvania Supreme Court has found such causation testimony inadmissible in an asbestos action, citing in support **Betz v. Pneumo Abex, LLC**, 44 A.3d 27 (Pa. 2012),[10] and **Gregg v. V-J Auto Parts, Co.**, 943 A.2d 216 (Pa. 2007).[11]

*(Footnote Continued)* ―――――――――

[9] Collectively, Appellants present similar arguments.  Thus, we will not distinguish between the Welding Companies and Crane Co. unless warranted.

[10] **Betz** was decided during the pendency of this appeal.  "[A] party whose case is pending on direct appeal is entitled to the benefit of changes in law[,] which occur[] before the judgment becomes final."  **Passarello v. Grumbine**, 29 A.3d 1158, 1164 (Pa. Super. 2011) (citations omitted), *affirmed*, 87 A.3d 285 (Pa. 2014).

[11] Appellants also cite **Howard v. A.W. Chesterton Co.**, 78 A.3d 605 (Pa. 2013) (*per curiam*).  Although **Howard** succinctly summarizes the law, its precedential value is questionable.  **See Howard**, 78 A.3d at 610 (Todd, J., concurring) (suggesting that the clarification of legal principles espoused by the *per curiam* order was merely *dictum*).  Accordingly, we will not rely upon it.

In relief, Appellants seek judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The following standards apply.

> In reviewing a motion for [JNOV], the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, a [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.
>
> There are two bases upon which a [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Estate of Hicks v. Dana Cos., LLC*, 984 A.2d 943, 950-51 (Pa. Super. 2009) (*en banc*) (quoting *Fletcher-Harlee v. Szymanski*, 936 A.2d 87, 93 (Pa. Super. 2007), *appeal denied*, 956 A.2d 435 (Pa. 2008), *cert. denied*, 129 S.Ct. 1581 (2009)).

> Similarly, when reviewing the denial of a motion for a new trial, we must determine if the trial court committed an abuse of discretion or error of law that controlled the outcome of the case.

*Id.* "When improperly admitted testimony may have affected a verdict, the only correct remedy is the grant of a new trial." *Collins v. Cooper*, 746

A.2d 615, 620 (Pa. Super. 2000) (quoting ***Bucchianeri v. Equitable Gas Co.***, 491 A.2d 835, 838-39 (1985)).

The guidance recently provided by the Pennsylvania Supreme Court in ***Betz*** is clear and proves to be dispositive. In that case, the Supreme Court considered the "admissibility of expert opinion evidence to the effect that each and every fiber of inhaled asbestos is a substantial contributing factor to any asbestos-related disease." ***Betz***, 44 A.3d at 30.[12] The expert opinion challenged was summarized in the following manner:

> Asbestos-related mesothelioma, like other diseases induced by toxic exposures, is a dose response disease: each inhalation of asbestos-containing dust from the use of products has been shown to contribute to cause asbestos-related diseases, including mesothelioma. Each of the exposures to asbestos contributes to the total dose that causes mesothelioma and, in so doing, shortens the period necessary for the mesothelioma to develop ... *[E]ach exposure to asbestos is therefore a substantial contributing factor in the development of the disease* that actually occurs, when it occurs.

***Id.*** at 31 (quoting Affidavit of John C. Maddox, M.D., 8/4/2005, at 12) (emphasis supplied by the ***Betz*** Court).

The Supreme Court reviewed both the scientific support for the any-exposure theory and the legal requirements of specific causation. Following

---

[12] Such opinion evidence is commonly referred to as the "any-exposure," "any-breath," or "any-fiber" theory of legal causation. ***Id.*** at 30. As the Supreme Court appears to have settled upon the "any-exposure" terminology, we adopt it for our purposes. ***See id.*** at 52-58.

a comprehensive analysis, the Supreme Court reiterated its observations set

forth in *Gregg*:

> We appreciate the difficulties facing plaintiffs in this and similar settings, where they have unquestionably suffered harm on account of a disease having a long latency period and must bear a burden of proving specific causation under prevailing Pennsylvania law which may be insurmountable. Other jurisdictions have considered alternate theories of liability to alleviate the burden. Such theories are not at issue in this case, however, and we do not believe that it is a viable solution to indulge in a fiction that each and every exposure to asbestos, no matter how minimal in relation to other exposures, implicates a fact issue concerning substantial-factor causation in every "direct-evidence" case. The result, in our view, is to subject defendants to full joint-and-several liability for injuries and fatalities in the absence of any reasonably developed scientific reasoning that would support the conclusion that the product sold by the defendant was a substantial factor in causing the harm.

*Id.* at 56-57 (quoting *Gregg*, 943 A.2d at 226-27) (citations omitted). The

Court concluded that the any-exposure theory was "*fundamentally*

*inconsistent with both science and the governing standard for legal*

*causation*." *Id.* at 57 (emphasis added).

In his attempt to dissuade this Court from rejecting Dr. DuPont's

testimony, Nelson submits that his expert did not rely upon the any-

exposure theory. Rather, according to Nelson, "Dr. DuPont found as

causative only significant exposures, such as when a person inhales visible

dust from an asbestos-containing product. Thus, as Dr. DuPont's testimony

was not dependent on an 'each and every breath' analysis, [Appellants']

19

argument … must be rejected out of hand." Nelson's Substituted Brief (filed in response to Welding Companies' appeal), at 18.[13]

Accordingly, we review Dr. DuPont's testimony. As set forth above, Dr. DuPont opined that mesothelioma occurs with "significant asbestos exposure." DuPont Video Deposition, at 32. In this context, he acknowledged that asbestos is present in the ambient air but suggested that the impact of such exposure is negligible. *Id.* at 33. In response to counsel's question, asking him to define "non-negligible exposure," Dr. DuPont replied, "Anything above ambient air in the opinion of many publications." *Id.* at 34. Thereafter, Nelson solicited the following testimony from Dr. DuPont:

> Q. All right. So now how do you make a determination? What these folks have to do is they have to decide, did one asbestos product cause these men to get the disease? Did two? Did three? Did five? Did ten? Did all of them? What kind of help can you provide in that area?
>
> …

---

[13] The candor with which Nelson argues that his causation evidence does not rely on the any-exposure theory is questionable, as it is at odds with the position taken before the trial court. *See, e.g.*, N.T., 3/9/2010 p.m., at 66 (joining in argument suggesting to the trial court that "the opinions having to do with each and every exposure have been allowed in courts far more exponentially more than the few cases … where it's been excluded"); *see also* Nelson's Answer to the Welding Companies' Miscellaneous Motion (seeking to preclude Dr. DuPont from testifying), at 2 ("Where there is competent evidence that one or a *de minimus* number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury.") (citation omitted in original).

[A.] The help that I can provide is to say the following, *it is accepted or believed that there are no innocent respirable asbestos fibers*.

*Id.* at 43 (emphasis added). Dr. DuPont concluded, then, in the following

manner:

Q. … If I ask you now specifically, to a reasonable degree of medical certainty what caused … Mr. Nelson to develop … mesothelioma, please tell me your answer[.]

…

[A.] The inhalation of fibers above the negligible amount already contained in the environment is the type of exposure that causes this disease, and that all of the fibers involved in that above the negligible amount, should be considered substantial in their causation. And furthermore, no fibers can be considered innocent or not involved with the understanding that we've already talked about.

*Id.* at 49-50. And, finally;

Q. Did each individual exposure that [Nelson] had above a non-negligible level, were [*sic*] [he] inhaled airborne asbestos dust constitute a substantial and contributing factor to the disease that they developed?

…

[A.] Yes.

*Id.* at 53.

Thus, according to Dr. DuPont, (1) mesothelioma occurs as a result of

significant exposure to asbestos, defined as (2) *any exposure* above the

negligible amount present in ambient air, and (3) such exposure constitutes

a substantial factor in developing mesothelioma. In this context, we cannot

21

ignore Dr. DuPont's admonition that no fibers are innocent and his conclusion that each individual exposure is substantially causative. In our view, this testimony is congruous with the expert opinion proffered in **Betz**.

Dr. DuPont's reference to the presence of asbestos in ambient air also reveals a paradox in his theory of causation. According to Dr. DuPont,

> [A]sbestos is present in the ambient air, and that is the air that we breathe.
>
> And in an urban area or like where I've practiced in an industrial area, there is a certain amount of asbestos in the air.
>
> …
>
> Right. And the point of what I was saying was that that is considered the ambient area. And the impact of that is felt to be negligible.

*Id.* at 33. Moreover, Dr. DuPont acknowledged that ambient levels of asbestos differ, depending on location:

> Q.    Ambient exposures can range in exposure levels, correct?
>
> A.    Correct.
>
> Q.    Okay. So if we're in [] rural Kansas without a factory nearby, it might be very low, but if you're in an industrial urban setting, it might be much higher, correct?
>
> A.    Correct.
>
> Q.    And we would lump all of those into the category of ambient?
>
> A.    We would[.]

*Id.* at 104. According to Dr. DuPont, different levels of ambient exposure are non-causative, yet Dr. DuPont finds causative each *incremental* exposure of an individual product, however small. *Id.* at 53.[14]

Dr. DuPont seemingly has no answer to this paradox, as he declined to offer testimony sufficient to establish the impact of incremental exposure posed by the products to which Nelson was exposed over his career at Lukens Steel. To the contrary, Dr. DuPont effectively conceded that he could not establish specific causation for any of the products. Consider the following testimony:

> Q.    All right. [] The jury has heard exposures to a number of different asbestos-containing products over whatever frequency the jury heard it, and they'll rely on their memory. Do you

------

[14] Notably, Dr. DuPont does not quantify the amount of asbestos found in different areas - a troubling omission in light of his reticence to testify to the impact of incremental exposure to asbestos contained in products in any but hypothetical terms. *See id.* at 58-62. We are not the first appellate court to voice this concern:

Simply stated, plaintiff's experts in this case, as well as in other asbestos cases, have never been able to explain the scientific and logical implausibility of agreeing to the premise that a lifetime of breathing asbestos in the ambient air will not harm a person, while on the other hand arguing that every breath of asbestos from a defendant's product, no matter how inconsequential, will.

*Betz*, 44 A.3d at 56 n.36 (quoting favorably from an appellant's brief); *see also Bostic v. Georgia-Pacific Corp.*, --- S.W.3d ---, *5 (Tex. 2014) ("Under the any exposure theory a background dose of 20 does not cause cancer, but a defendant's dose of 2 plus a background dose of 5 does.").

separate those exposures out for each individual product, assuming every exposure was above a non-negligible level?

A.    You don't.

Q.    Why?

A.    *You can't.*

***Id.*** at 39 (emphasis added).  And the following:

Q.    … A lot of mention have [*sic*] been made that these men worked at job sites where there was a lot of pipe covering around, with a lot of amphiboles in it, as well as other products that contained only chrysotile.  Even in that situation, do you as a scientist, as a medical expert, get to say, "Oh, it must have been the pipe covering that did it?"

A.    *I cannot.*

Q.    Again, why?

A.    There is no literature that I could go back to and quote to say that this product did it and this product didn't.  And you can say that one type of asbestos has a higher risk, but we're not talking about risk here.   Risk is the potential of getting a condition. There is no risk here about potentially getting a condition.  The condition was there.

***Id.*** at 51 (emphasis added).

However, these are precisely the questions an expert must answer in order to establish that Appellants' products were a substantial factor in causing Nelson's disease.  ***See Fisher v. Sexauer***, 53 A.3d 771, 775 (Pa. Super. 2012) ("[C]ausation of asbestos-related injuries is shown upon proof that the plaintiff inhaled some fibers from the products of the defendant manufacturer.") (quoting ***Andaloro v. Armstrong World Indus., Inc.***, 799

24

A.2d 71, 86 (Pa. Super. 2002)); *see generally Summers v. Certainteed Corp.*, 997 A.2d 1152, 1164-65 (Pa. 2010) (discussing requirement that plaintiff prove a defendant's product was a substantial factor in causing disease).

For the above reasons, we conclude that Dr. DuPont's testimony was inadmissible. Moreover, as this expert testimony was necessary to establish legal, or substantial-factor, causation, its improper admission controlled the outcome of the case. Accordingly, we vacate the judgment entered and remand for a new trial on liability.[15]

Appellants also assert that Nelson introduced insufficient evidence of exposure to respirable asbestos, citing in support *Gregg*, 943 A.2d at 226 (requiring asbestos plaintiffs to prove specific causation), and *Eckenrod v. GAF Corp.*, 544 A.2d 50, 52-53 (Pa. Super. 1988) (requiring proof that a plaintiff "inhaled asbestos fibers shed by the specific manufacturer's product); *et al*. On remand, the parties will adduce a record substantially different from the one currently before us. Accordingly, we decline to examine Appellants' assertion in detail.[16]

---

[15] Considering the impact *Betz* has on asbestos product liability law in Pennsylvania, and the fact that the Supreme Court delivered its holding during the pendency of this appeal, we decline to grant Appellants JNOV.

[16] Crane Co. asserts that Nelson failed to establish exposure with sufficient frequency, regularity and proximity. *See Eckenrod*, 544 A.2d at 53.
*(Footnote Continued Next Page)*

Separately, Crane Co. asserts that it is entitled to relief on the ground that Nelson failed to use Cranite in an intended manner. In Pennsylvania, strict liability does not extend beyond the use of a product in its intended manner.

> [A] manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a

*(Footnote Continued)* ———————————

The Welding Companies challenge Nelson's failure to proffer expert testimony to establish exposure to respirable asbestos fibers emitted from their products. To date, the courts of this Commonwealth have not imposed a requirement to establish exposure with expert testimony. *See Fisher*, 53 A.3d at 775-76 (citing *Junge v. Garlock*, 629 A.2d 1027, 1029 (Pa. Super. 1993); *Lilley v. Johns-Manville Corp.*, 596 A.2d 203 (Pa. Super. 1991)); *Donoghue v. Lincoln Elec. Co.*, 936 A.2d 52 (Pa. Super. 2007) (rejecting arguments similar to those raised by the Welding Companies here); *but see also, e.g.*, *Grossman v. Barke*, 868 A.2d 561, 567 (Pa. Super. 2005) (indicating that the requirement for expert testimony "stems from judicial concern that, absent the guidance of an expert, jurors are unable to determine relationships among scientific factual circumstances") (quoting *Brannan v. Lankenau Hosp.*, 417 A.2d 196, 199-200 (Pa. 1980)); *Ovitsky v. Capital City Econ. Dev. Corp.*, 846 A.2d 124, 126 (Pa. Super. 2004) ("It is well-established that 'expert opinion testimony is proper only where formation of an opinion on a subject requires knowledge, information, or skill beyond what is possessed by the ordinary juror.'") (quoting *Commonwealth v. Carter*, 589 A.2d 1133, 1134 (Pa. Super. 1991)).

The Welding Companies specifically contend *Donoghue* was wrongly decided and encourage this Court *en banc* to overrule that panel decision. We decline to do so, except to the extent it treats favorably a plaintiff's expert causation testimony based upon the any-exposure theory. *Donoghue*, 936 A.2d at 57, 64. Moving forward, *Donoghue* shall not be cited with approval to the extent that it provides or implies that the any-exposure theory of specific causation is admissible in an asbestos action.

26

manufacturer. The Court has also construed the intended use criterion strictly, holding that foreseeable misuse of a product will not support a strict liability claim.

***Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.***, 898 A.2d 590, 600-01 (Pa. 2006) (***DGS***) (citing ***Phillips v. Cricket Lighters***, 841 A.2d 1000, 1007 (Pa. 2003) (plurality opinion authored by Cappy, C.J., with Castille, J., Newman, J., Saylor, J., and Eakin, J. concurring on this point)).[17]

Here, Crane Co. solicited testimony to establish that Cranite was intended for use as a gasket to seal fluid systems, and not as a welding shield. Crane Co. proffered further testimony in this regard, but was precluded from doing so. Moreover, at various stages of the litigation, Crane Co. argued that Nelson failed to meet its evidentiary burden to establish that Cranite was unsafe for its intended use.

The trial court rejected Crane Co.'s arguments, suggesting in its Rule 1925(a) opinion that the intended use doctrine was inapplicable to a failure to warn case. ***See*** Trial Court Opinion (TCO), 06/13/2011, at 13. We disagree.

---

[17] The doctrine is not without exception. ***See, e.g.***, ***DGS***, 898 A.2d at 601 n.10 (recognizing that a manufacturer may be held strictly liable for "subsequent changes to an otherwise safe product, where such alterations are reasonably foreseeable") (citing ***Davis v. Berwind Corp.***, 690 A.2d 186, 190 (Pa. 1997)). Moreover, there is little doubt that our product liability law engenders controversy. ***See, e.g.***, ***Schmidt v. Boardman Co.***, 11 A.3d 924, 940 (Pa. 2011) (acknowledging "material ambiguities and inconsistencies" in Pennsylvania's strict liability law); ***Berrier v. Simplicity Mfg., Inc.***, 563 F.3d 38, 56-57 (3d Cir. 2009) (reviewing cases).

It is well settled a dangerous product can be considered "defective" for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product. Such warnings must be directed to the understanding of the intended user. The duty to adequately warn does not require the manufacturer to educate a neophyte in the principles of the product. A warning of inherent dangers is sufficient if it adequately notifies the intended user of the unobvious dangers inherent in the product.

*Mackowick v. Westinghouse Elec. Corp.*, 575 A.2d 100, 102 (Pa. 1990) (citations omitted); *see also Phillips*, 841 A.2d at 1005 (citing *Mackowick* favorably). Thus, the doctrine is applicable here.

The trial court further suggested that Nelson established that Crane Co. "failed to provide a warning of the health risk inherent in exposure to its product[] for its intended user." TCO at 13. However, this conclusion finds no evidentiary support. Indeed, Nelson failed to introduce any evidence that he, or anyone else, was an intended user of Cranite, and the court expressly and repeatedly declined Crane Co.'s attempts to introduce evidence relevant to the intended use doctrine.

The trial court's position is untenable, but that does not end our inquiry. As noted by Nelson, this Court has stated previously that the feature that renders an asbestos product unsafe for its intended use derives from the presence of asbestos in the product, and specifically, "the dangers from inhalation of asbestos fibers that can be emitted from the product." *Estate of Hicks*, 984 A.2d at 968. Responding directly to Crane Co.'s arguments, Nelson asserts that Cranite was unsafe for *anyone who cut the*

*material*, as would an intended user, because this would release asbestos fibers. Nelson posits that there was sufficient evidence for the jury to find that he used Cranite in a manner consistent with its intended use and that his use of Cranite resulted in exposure to asbestos. Thus, according to Nelson, the intended use doctrine does not insulate Crane Co. from liability.

Nelson's concise argument is persuasive but asks too much from this Court. We infer from Nelson's argument that "intended use" of a product is more than simply its "purpose," a proposition with which we agree. Intended use necessarily includes those intermediate steps required to fulfill a product's purpose. For example, Crane Co. asserts that Cranite was a fluid systems sealant. This describes the purpose of Cranite. However, Cranite was produced and distributed in a sheet form requiring user modification. It is readily apparent that its purpose could be fulfilled only after certain intermediate steps were taken by the user, including, *e.g.*, cutting sheets of Cranite into a useful form or size, or otherwise manipulating the product by hand – precisely the manner in which Nelson suggested he used Cranite.

Thus, it may well be that Nelson presented sufficient evidence for a jury to find that he used Cranite in a manner *consistent with* its intended use, a finding that would negate Crane Co.'s argument. It will be for the trial court to define what precisely constitutes an intended use of Cranite. However, the jury must be afforded an opportunity to make a finding, and we will not presume which facts will be accepted by the jury. **See DGS**, 898

29

A.2d at 604 (remanding for a new trial because it was unclear whether the jury accepted facts relevant to the intended use doctrine); *see also Collins v. Cooper*, 746 A.2d 615, 620 (Pa. Super. 2000) (noting the court's discretion in evidentiary matters but observing that where evidentiary errors "may have affected a verdict, the only correct remedy is the grant of a new trial") (quoting *Bucchianeri v. Equitable Gas Co.*, 491 A.2d 835, 838-39) (Pa. Super. 1985)).  Therefore, on remand, Nelson may endeavor to establish that he used Cranite in a manner consistent with its intended use, as defined by the trial court, and, further, Crane Co. shall be permitted to challenge Nelson's evidence, adducing evidence of its own that Nelson's use was inappropriate.

Crane Co. also suggests that Nelson's employment as a welder is relevant to the doctrine.  According to Crane Co., because Nelson was not an intended user, such as, *e.g.*, a plumber, strict liability must not attach.  We disagree.

The "intended user" formulation is merely a derivative of the intended use doctrine.  As we have previously observed, "a plaintiff must establish that the product was unsafe for its intended user." *Estate of Hicks*, 984 A.2d at 977 n.21 (quoting *Phillips*, 841 A.2d at 1007).  Implicitly, though, the intended user will be sufficiently familiar with the appropriate manner in which to use a product, as well as any overt safety considerations.  Thus, it is only necessary for the manufacturer to address adequately dangers

inherent in a product that are "unobvious" to an intended user. ***Mackowick***, 575 A.2d at 102.

Absent evidence suggesting that Nelson's employment as a welder was material to an unintended use of Cranite, his job title is of little consequence. On remand, the relevant questions will remain whether Nelson used Cranite in a manner consistent with its intended use; and, ultimately, whether Crane Co. provided warnings sufficient to insure the safety of those who used it accordingly.

We now turn to Appellants' claims regarding the damages phase. Collectively, Appellants also contend that improper remarks by Nelson's counsel during closing arguments in the damages phase warrant a new trial.[18] The law in this regard is well settled.

> [W]hether to declare a mistrial is yet another decision within the discretion of the trial court, whose vantage point enables it to evaluate the climate of the courtroom and the effect on the jury of closing arguments.

***Clark v. Phila. Coll. Of Osteopathic Med.***, 693 A.2d 202, 206 (Pa. Super. 1997). Though not every prejudicial comment by counsel warrants a new trial, "there are certain instances where the comments of counsel are so offensive or egregious that no curative instruction can adequately obliterate

---

[18] In light of our disposition of the other issues presented, we decline to address Appellants' arguments directed toward counsel's closing argument in the liability phase of the trial.

the taint." ***Poust v. Hylton***, 940 A.2d 380, 386 (Pa. Super. 2007) (emphasis omitted) (quoting ***Siegal v. Stefanyszyn***, 718 A.2d 1274, 1277 (Pa. Super. 1998)); ***see also Young v. Washington Hosp.***, 761 A.2d 559, 562-63 (Pa. Super. 2000).

According to Appellants, Nelson's counsel urged the jury to award a specific dollar amount for non-economic damages.[19] It is well established in Pennsylvania that a plaintiff's counsel may not suggest an amount of damages claimed or expected but not supported by the evidence. ***See Wilson v. Nelson***, 258 A.2d 657, 660 (Pa. 1969) ("In an action where damages are sought, any statement to the jury by counsel that calls the juror's attention to claims or amounts not supported by the evidence is error."); ***Stassun v. Chapin***, 188 A. 111, 127-28 (Pa. 1936) (stating that counsel may not suggest an amount for damages "incapable of measurement by a mathematical standard); ***Bullock v. Chester & Darby Telford Rd. Co.***, 113 A. 379, 380 (Pa. 1921) ("The verdict in an action of tort should be a deduction drawn by the jury from the evidence, and not a mere formal adoption of calculations submitted by counsel."); ***Joyce v. Smith***, 112 A. 549, 551 (Pa. 1921).

_____

[19] The Welding Companies contend that counsel suggested the jury award $12 million in pain and suffering. Crane Co. submits that counsel requested at least $1 million for each of twelve elements of damages. Appellants further contend that the trial court's subsequent instruction on damages provided no curative effect.

In ***Joyce***, the plaintiff was struck and injured by the defendant's automobile. ***Joyce***, 112 A. at 550. Defendant objected to remarks made by plaintiff's counsel during closing arguments to the jury. ***Id.*** The precise content of the remarks was unclear from the record, but the parties submitted affidavits to the court, setting forth their recollections of counsel's argument. ***Id.*** While defendant asserted that counsel had asked for "thousands of dollars for pain and suffering," plaintiff attested that counsel said, "I shall not ask you for thousands of dollars for his injuries." ***Id.*** The Court found both versions improper. ***Id.*** Accepting plaintiff's version as true, the court reasoned:

> While it is true in the present case, no definite amount was mentioned, yet, if plaintiff's version be accepted, the language contained a suggestion to the jury that 'thousands of dollars' were claimed for pain and suffering. This expression suggested the amount to the minds of the jury almost as clearly as if counsel had stated a definite number of thousands.

***Id.***

Nelson counters that there is no prohibition against arguing that a plaintiff's non-economic damages are worth substantially more than an amount of proven economic loss, echoing the analysis of the trial court below and citing in support ***Clark***, *supra*. In ***Clark***, the appellants similarly claimed that the plaintiff's counsel had improperly suggested a formula for pain and suffering during closing argument. ***Clark***, 693 A.2d at 206. The plaintiff's counsel displayed the drawing of a triangle, crossed near the peak

33

by a line. *Id.* Referencing the drawing, counsel suggested that the plaintiff's economic damages of approximately $2 million represented only the "tip of the iceberg," and that damages for pain and suffering were what remained below the "water" line. *Id.* The trial court denied the appellants' motion for a mistrial, concluding that "[w]hether the tip of the iceberg argument is called rhetoric, analogy or metaphor, it was not a direct statement suggesting any specific sum or arbitrary amount," and a panel of this Court agreed. *Id.* (quoting the trial court opinion).

However, based upon the record before us, *Clark* is distinguishable. Here, during closing argument, counsel displayed the verdict sheet to the jury. On the verdict sheet, twelve elements of non-economic damages were listed, seven under the Survival Act and another five under the Wrongful Death Act.[20] Highlighting these elements, counsel queried:

> How [do you decide on a number?] Think of these, if you would, as different awards. Even though it's all going to go on one line, I think it will be easier for you if you think of these as different elements of damages.

---

[20] The verdict sheet listed seven elements under the Survival Act: physical pain, mental anguish, embarrassment, humiliation, disfigurement, discomfort and inconvenience; and five under the Wrongful Death Act: loss of society, comfort, support, assistance, and companionship. *See* Jury Verdict Slip, 3/9/2010, at 1-2.

N.T., 3/8/2010, at 78.   In this context, counsel referred to the economic damages agreed to by the parties and, thereafter, addressed the elements of non-economic damages under the Survival Act in the following manner:

> Economic loss … We have agreed.  We have stipulated …  we have agreed that the economic losses that you can accept as true equal $1 million.  I repeat, $1 million, and that's where you start at.  You start there.
>
> You haven't even gotten to the physical pain yet. You haven't gotten to that anguish yet. You haven't gotten to the embarrassment and humiliation, the disfigurement, discomfort and inconvenience.  Again, I need somebody to remember you must start at $1 million.
>
> …
>
> It's so important it bears repeating. You start at $1 million, and I believe each of those elements of damages starting at physical pain are worth infinitely more than that $1 million figure.[21] Now, you add a million plus whatever other numbers you assign for these and you write that number there.

*Id.* at 79-81.  After discussing Darlene Nelson's claim for loss of consortium, counsel addressed the elements of non-economic damages under the Wrongful Death Act:

> You now move. You may think this is somewhat similar but the measuring periods are different now.  This is the loss of society, comfort, support, assistance and companionship to Darlene Nelson because her husband died.
>
> Again, what you might say is those things are the same. I told you, this number should be significant and substantial. This should be more so.  Much more than this.

---

[21] Referencing the stipulated economic damages.

*Id.* at 82.

Effectively, counsel (1) identified twelve individual elements of non-economic damages; (2) suggested to the jury that it consider a different award for each element but then add the individual amounts onto a single line, and (3) in rather express language, suggested that the jury award Nelson at least $1 million for each. Thus, unlike the closing remarks in **Clark**, where the plaintiff's counsel metaphorically referred to economic damages as the "tip of the iceberg," here counsel for Nelson provided the jury with a formula to calculate damages and an amount to plug into that formula. Here, counsel's express reference to the stipulated economic damages was not evocative, but declarative and algebraic. It is no coincidence, therefore, that the jury's award to Nelson comprised $7 million in non-economic damages pursuant to the Survival Act and $5 million in non-economic damages under the Wrongful Death Act. Clearly, counsel's remarks were inappropriate.

Moreover, the trial court did not address the jury concerning counsel's inappropriate remarks. It administered no curative instruction and denied Appellants' immediate request for a mistrial. We have also reviewed the court's instructions on damages, and while we discern no error in their substance, they provided no curative effect to counsel's inappropriate remarks. We deem the court's failure to cure an abuse of its discretion.

36

We reach this decision mindful of Appellants' other complaints regarding counsel's closing arguments in the damages phase. For example, Appellants contend that counsel inserted an inappropriate reference to settlement discussions, citing in support Pennsylvania Rule of Evidence 408 (precluding evidence of conduct or statements made during settlement negotiations). Counsel stated:

> Has it dawned on any of you yet that the reason we're here, and the only reason we're here, is because I can't agree with these people [on] the value of my client's life?
>
> I can't agree with any of these people on how much money should be awarded to these families for what has been done in this case, for taking Jim Nelson's life, … for having the tumor eat through [his] chest, sucking the life [out of him.]
>
> We can't agree. That's why we need you.

N.T., 3/8/2010, at 48. Appellants also complain that counsel inserted a punitive element into his discussion of damages:

> [A]t the end of the day, ladies and gentlemen, you represent the conscience of the community, and I'm asking you to award an amount of money that is so significant and substantial that it will do justice that everyone will know that justice is done, not just the Nelson family, … but everybody that's in this community. Do not let [this man] die in [vain].

*Id.* at 83-84.

Such language is inflammatory, particularly to the extent that it attributes improper motives to Appellants. Thus, we admonish counsel to refrain from needlessly inflaming the passions of the jury. *See Young*, 761 A.2d at 563 (noting that "an appeal to passion or prejudice is improper and

will not be countenanced" and equating a verdict obtained by such arguments to "one obtained by false testimony"); *see also Schmidt*, 11 A.3d at 939 (recognizing a "central premise that negligence concepts have no place in Pennsylvania's strict liability law"); *Phillips*, 841 A.2d at 1007 ("Strict liability focuses solely on the product … and is divorced from the conduct of the manufacturer."). Nevertheless, we express no further opinion regarding these latter complaints and limit our decision to grant a new trial on damages based upon counsel's improperly suggesting to the jury a formula for calculating non-economic damages.

Finally, Appellants contend that the trial court erred in consolidating this case with four other, unrelated cases, and in ordering the case to proceed in a reverse-bifurcated manner. Following an examination of its Mass Tort Program, the Philadelphia Court of Common Pleas directed the implementation of certain revisions affecting the conduct of asbestos trials in the county. *See* Order of Court, 02/15/2012 (implementing General Court Regulation No. 2012-01). In particular, we observe that (1) reverse bifurcation will not occur, absent agreement by all counsel involved, and (2) consolidation is now subject to several express criteria. *Id.* Accordingly, we deem Appellants' contention moot.

In conclusion, we vacate the judgment entered February 23, 2011, and remand for a new trial, both on liability and damages. Regarding liability, Appellants are entitled to a new trial, as Nelson introduced

causation evidence premised upon the any-exposure theory. ***See Betz***, 44 A.3d at 57. On remand, Crane Co. shall be permitted to introduce evidence relevant to the intended use doctrine. ***See, e.g.***, ***DGS***, 898 A.2d at 600-01. Regarding damages, trial counsel shall refrain from inappropriately suggesting to the jury an amount suitable for non-economic damages. ***See Joyce***, 112 A. at 551.

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judge Bowes, Judge Shogan, Judge Allen, Judge Stabile, and Judge Jenkins join this opinion.

Judge Wecht files a dissenting opinion in which President Judge Emeritus Ford Elliott joins and Judge Ott concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2014