J-S23015-19

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN THE INTEREST OF:  D.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  B.D. NATURAL MOTHER | No. 1604 WDA 2018 |

Appeal from the Order Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
At No(s):  CP-25-DP-0000170-2017

| | |
|---|---|
| IN THE INTEREST OF:  R.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  B.D. NATURAL MOTHER | No. 1605 WDA 2018 |

Appeal from the Decree Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
at No(s):  CP-25-DP-0000171-2017

| | |
|---|---|
| IN THE INTEREST OF:  J.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  B.D. NATURAL MOTHER | No. 1606 WDA 2018 |

Appeal from the Order Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
At No(s):  CP-25-DP-0000172 of 2017

| | |
|---|---|
| IN THE INTEREST OF:  E.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  B.D. NATURAL MOTHER | No. 1607 WDA 2018 |

Appeal from the Decree Entered October 22, 2018
In the Court of Common Pleas of Erie County Juvenile Division
At No(s):  CP-25-DP-0000173-2017

BEFORE: BENDER, P.J.E., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    FILED MAY 31, 2019

B.D. (Mother) appeals from the orders, dated October 19, 2018, and entered on the docket in the Court of Common Pleas of Erie County on October 22, 2018, which changed the permanency goal for her four sons to adoption.[1] After review, we affirm.

On appeal, Mother's brief contains the following question for our review:

WHETHER THE JUVENILE COURT COMMITTED AN ABUSE OF DISCRETION AND/OR ERROR OF LAW WHEN IT CHANGED THE SOLE PERMANENCY GOAL REGARDING THE CHILDREN TO ADOPTION.

Mother's brief at 4.

We review issues relating to the changing of the placement goal for children to adoption pursuant to the following:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010).

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, inter alia:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] J.P. (Father) also filed appeals from the orders that granted the goal change for each of his sons. Father's appeals are docketed at Nos. 1588 WDA 2018, 1589 WDA 2018, 1590 WDA 2018 and 1592 WDA 2018.

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.
>
> In re A.B., 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

In re J.D.H., 171 A.3d 903, 908 (Pa. Super. 2017).

We have reviewed the certified record, Mother's brief,[2] the applicable law, and the comprehensive opinion authored by the Honorable Shad Connelly, senior judge of the Court of Common Pleas of Erie County, filed January 14, 2019. We conclude that Judge Connelly's well-reasoned opinion disposes of the issue raised by Mother. Accordingly, we adopt Judge Connelly's opinion as our own and affirm the orders appealed from on that basis.

Orders affirmed.

---

[2] No other party has filed a brief in connection with this appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2019

IN THE INTEREST OF
D.P., R.P., J.P., and E.P.,       :    IN THE COURT OF COMMON PLEAS
          Minors         :    OF ERIE COUNTY, PENNSYLVANIA
Adjudicated Dependent       :    JUVENILE DIVISION

APPEAL OF B.D.,          :    NO. 170, 171, 172, 173 OF 2017
Natural Mother

## 1925(a) OPINION

On October 22, 2018 an order was entered in a dependency action changing the goal to adoption for D.P., R.P., J.P., and E.P., minor children of B.D. (Appellant/Mother). The mother now challenges that order. The mother is contending this court erred and / or abused its discretion when it eliminated reunification as a goal. The record supports that the finding of change of goal to adoption was established by clear and convincing evidence and is in the best interests of the children. It is therefore requested the Superior Court affirm the order.

## PROCEDURAL HISTORY AND FACTS

D.P., born June ●, 2006; R.P., born January ●, 2009; J.P., born May ●, 2012; and E.P., born October ●, 2015, are all children of B.D., natural mother, and J. P., natural father. The family had been living in North Carolina, but moved to Erie. In May, 2017, OCY received allegations that the mother had physically assaulted some of the children. The father filed a PFA Petition on behalf of the children against the mother that was eventually withdrawn. Services were opened with OCY in May, 2017, but ultimately, all four children were removed from the parents' care and placed in foster care. An Adjudication/Dispositional Hearing was held on August 14, 2017 before this court. OCY had filed Dependency Petitions for the children. The parents stipulated that their children were without proper parental care or control based upon the following allegations:

1

1. The (parents have) a history with the Agency due to concerns of abuse, unstable housing, domestic violence, and lack of follow through with services. Furthermore, the family was involved with ongoing services since May, 2017 and (they) failed to alleviate the issues;

2. The (parents) have an extensive history in North Carolina due to concerns of physical abuse, neglect, deplorable home conditions, and drug and alcohol abuse. The cases in North Carolina were ultimately unfounded and closed by CYS.

3. The (parents) have failed and/or are unwilling to provide a safe and stable living environment. Furthermore, the home had an infestation of mice and bed bugs in May, 2017 and the conditions have since worsened resulting in the family being evicted.

4. The (parents) have failed and /or are unwilling to seek treatment for (their) mental health

The mother additionally admitted:

5. (The mother) has previously had two children removed from her care over 20 years ago and successfully placed for adoption;

6. (The mother) has physically abused the minor (children). Furthermore, the (children) reported that (they are) fearful of (the mother) due to her hitting, scratching, pulling (their) hair, and throwing objects at (them);

7. (The mother) has a criminal history including Aggravated Assault and Criminal Conspiracy.

The father additionally admitted:

5. (The father) has failed to prevent physical abuse to the minor (children). Furthermore (the father) disclosed witnessing the abuse and neglect of his (children) on multiple occasions; however he has failed to protect the (children);

6. (The father) has failed to provide a safe and stable home for the minor (children). Furthermore, he continues to leave (the mother) in a caregiver role despite witnessing abusive behaviors.

Services had been extended to the family prior to the necessity of the children's removal and adjudication of dependency. Calls were received by OCY in May, 2017 alleging physical abuse to the children. Investigations determined the abuse was unfounded, but services were opened. Subsequently, J.P. filed a Protection From Abuse Act Petition on behalf of the children against the mother, B.D. Prior to any action on the petition, the children were removed and the dependency actions begun. The court issued a Dependency/Dispositional Order on August 17,

2

2017, finding all 4 children dependent based upon the stipulated allegations of fact, and ordering the parents to be involved with a number of services. The goal was reunification of the family.

One of the main agencies involved with the family was Family Based Mental Health. Jessica Edmunds was the therapist assigned to the family. Edmunds began working with the family in June, 2017, and described the program as providing services in therapy, case management and crisis. (*10/10/2018 N.T. p.5*). The goals or problem areas being addressed with the family were community- maintaining contact with all family service providers; family-boundaries and expectations and consequence with the parents, including anger management and parenting techniques; and individual - needs such as coping and communication skills (*10/10/2018 N.T. p. 5-6*).

Initially, J.P. and B.D., the parents, were together in sessions. However, their relationship during the sessions was deemed "too toxic" by Ms. Edmunds, meaning constant arguments, disagreements, an overall unhealthy atmosphere. Eventually, the joint sessions were terminated, and the parents were seen individually once they had split up. *Id.* J.P. wanted one of his goals to be distancing himself from B.D. The father indicated on more than one occasion that he needed to distance himself from the mother. (*10/10/2018 N.T. pp. 35-36, 37-38*). Despite the positive effort J.P. appeared to be giving with Ms. Edmunds' and the program, she found that he would normally take two steps forward, and then two back, Something would cause him to become upset and be more negative. (*10/10/2018 N.T. p. 9*). Although J.P. had stipulated to the finding of dependency of his children, he would tell Ms. Edmunds that the children shouldn't have been removed. (*10/10/2018 N.T. p. 37*).

B.D. would participate in sessions and read the materials she was given. However, the mother disagreed with all the parenting techniques with which she was instructed. B.D. never

3

agreed with any of the materials she was given for the purpose of helping to raise her children. *(10/10/2018 N.T. pp. 33, 36).* B.D. was terminated from the Family Based Mental Health program in July, 2018 because she was deemed not therapeutically appropriate as she refused to utilize the materials she was provided, and was surreptitiously recording therapy sessions. *(10/10/2018 N.T. pp. 6-7, 17).*

The precipitating event which led to the termination of B.D. from the Family Based service occurred on June 19, 2018. The mother was having a supervised visit with the oldest child, D.P. Ms. Edmunds was supervising the visit and was observing it behind a one-way mirror at OCY. The child was not in a good mood, and the mother constantly pressed him as to what was wrong. D.P indicated that the mother wasn't working to get the children back, and mentioned abuse. This caused a very vocal and explosive disagreement. B.D. called her child a "liar", and rejected his feelings about the situation. *(10/10/2018 N.T. pp. 6-9).* D.P. started talking about past abuse and told his mother that if she ever hit him again, he would hit her back. Mom's response was that if he raised a hand to her, she would "beat his ass", and told him he was the reason she had lost her family. *(9/9/2018 N.T. p. 39).* Ms. Edmunds had to intervene and had the child removed. One of the areas that Ms. Edmunds had been working with B.D. on was appropriate ways to talk to children. It was another of the parenting techniques B.D. rejected, and resulted in the June 19th blow-up. After this visit, and the revelation about recording therapy sessions, B.D. was discontinued from Family Based Mental Health. (10/10/2018 *N.T. pp. 9, 33).*

Shannon Spiegel of OCY was the family's caseworker beginning in December 2017. Throughout the Agency's involvement with B.D., the mother did not acknowledge any issue about her ability to care for the children or the reasons the children were in OCY's care.

4

*(9/9/2018 N.T. pp. 39-40)*. This attitude was in spite of B.D.'s admissions in August, 2017 of her abuse and inability to properly parent her children.

Although the plan through June, 2018 was to reunify the children with the father, who had split from B.D., he admitted to a "co-dependent relationship with her, and that he could not get away from the mother; that she was a "drug" to him. *(9/9/2018 N.T. p. 40, 69)*. Services were offered to J.P. to deal with this co-dependency issue, services he stated he wanted. *(10/10/2018 pp. 35-36)*. OCY was going to increase unsupervised visits with the father one child at a time so as not to overwhelm him. The first weekend visit on the June 8, 2018 with D.P. went well. *(9/9/2018 N.T. p. 34)*. There were a number of discussions with the father that there was to be no unauthorized contact with the mother. *(9/9/2018 N.T. pp. 34-35, 37-38, 70 -71)*. Another weekend visit took place the following weekend, which happened to include Father's Day. At first, it appeared that visit had no issues. However an allegation was received on June 25[th] that the father had taken the child to the mother's house without permission, and that there was a plan to reunite with the children, later with mom, and then move out of state, *36)*. *(9/9/2018 N.T. pp. 35-36)*. J.P. was confronted with this allegation. Initially, the father said B.D. showed up at a friend's picnic unexpectedly where the dad and child were, and that he later left. Ms. Spiegel talked to D.P. later about how the visits were going. Ms. Spiegel learned that J.P. had taken D.P. over to the mother's residence, where the child spent the night. D.P. told Spiegel that he didn't want to go to his mother's on Father's Day, but he didn't want to disappoint his dad. D.P. had never been to the mother's residence, but was able to describe the layout, and said mom knew they were coming because they didn't have to break into the house. *(9/9/2018 N.T. pp. 35-37)*. The father was confronted after Ms. Spiegel talked to D.P., and he admitted he allowed the child to have unsupervised, unauthorized contact with B.D. and let the child spend the night. *Id.*

5

Unfortunately, after this visit, D.P.'s behaviors escalated in the foster home, and he ultimately had to be removed. *Id.* D.P. also had to be hospitalized for mental health reasons a little later in the summer. Jessica Edmunds stated there was a correlation between the visits with mom in June and the escalation in D.P.'s behaviors. *(9/9/2018 N.T. pp 26-27).*

Shannon Spiegel concluded that despite the efforts of O.C.Y., Family Based Mental Health and other services, the ties between the mother and father were not being eliminated. J.P. had not alleviated any of his co-dependency with the mother, and failed to show an ability to care for himself on his own , or care for his children. Despite the lengthy history of involvement with child protective agencies in multiple jurisdictions, the dad did not acknowledge or realize why his children were in care. J.P.'s relationship with OCY was turbulent at times. He would thank the Agency for intervening and helping him, then accuse it of kidnapping children and selling them. J.P. did not consistently accept responsibility as to the reasons his children were adjudicated dependent. *(9/9/2018 N.T. pp 44, 64, 71-72).* B.D. had been terminated from services by Family Based Mental Health after it was determined the mother was not involved with it on a therapeutic level, and she was recording sessions without permission. *(9/9/2018 N.T. p. 65-66.).*

Ms. Spiegel felt that continuing contact with the parents resulted in continuing trauma for the children. *(9/9/2018 N.T. pp. 65-66).* The two youngest children, J.P. and E.P., were in a potential adoptive home. D.P. wanted to be adopted, but have some form of contact with his father. R.P., 9 years old, had made statements he did not want to be adopted. *(9/9/2018 N.T. pp. 41-43).* Both D.P. and R.P. have indicated that they have concerns about their father's ability to protect them from their mother. *(9/9/2018 N.T. p 61).* Spiegel had no confidence that J.P. could stay away from B.D. and believed the best interests of the children necessitated a change of goal from reunification to adoption. *(9/9/2018 N.T. p 43, 44-45).*

6

Julie Lafferty, a supervisor at OCY, was involved in the case from its inception in July, 2017, and was Shannon Siegel's supervisor. *(9/9/2018 N.T. pp70-71, 75)*. Ms. Lafferty corroborated Spiegel's description of the father's attitude towards OCY. From J.P.'s allegations of kidnapping; taking children for cash; and illegally removing them and stealing them every day, to his contacting a state representative's office claiming his children were kidnapped, and his wife wasn't being given a chance to work for reunification, Lafferty concluded the circumstances of the children's placement had not been alleviated by the parents. *(9/9/2018 N.T. pp. 71-74)*. Ms. Lafferty did not believe J.P. could protect the children from B.D., or that he would choose them over mom, because he and the mother had no desire to be apart, or give each other up. Neither parent has any idea how their behaviors affect their children, and the children do not believe dad will protect them, and that he will get back together with the mother. *(9/9/2018 N.T. pp75-80)*.

J.P. admitted taking D.P. to see the mother; that he has discussed moving to North Carolina with the children; and that he still feels the children were prematurely removed. *(10/10/2018 N.T. pp. 45, 52, 56)*. The father agreed that he stated his relationship with B.D. was like an addict relapsing, and that he is co-dependent with her. *(10/10/2018 N.T. pp 65-66)*. J.P acknowledged the children suffered from past abuse and trauma and that there was not a healthy relationship between the mother and children. *(10/10/2018 N.T. pp 76-78)*.

The father denied making belligerent statements to Shannon Spiegel or Agency staff. He also denied posting items on Facebook about his animosity towards government officials or CPS workers. *(10/10/2018 N.T. pp. 82-83)*. J.P. admitted he goes by the name J.D. on his Facebook account. *(10/10/2018 N.T. p. 85)*. During the lunch recess, J.P. deleted his Facebook account. *(10/10/2018 N.T. p. 92)*. Before the account was deleted, copies of posts from September 7, 14

7

and 23, 2018 were made and marked as exhibits. The posts from September 7, 2018 were Exhibits 1 and 2; September 14, 2018 was Exhibit 3; and September 23, 2018 marked Exhibit 4. (10/10/2018 N.T. pp.92-94). Exhibit 1 reads "WOW..what a weird hearing..Courtroom was shut down for an hour." Exhibit 2 reads "Wife shut whole dam court hearing down for over an hour...over her phone...lol". Exhibit 3: " Ah hell.. Let's just get this war started..hit all SW(Social Workers) at their home like they did us. Post their homes and neighborhood.". Exhibit 4: "Halloween..time to put on a mask and HIT EM HARD...fuk CPS social workers.". J.P. admitted he posted the exhibits, but as to Exhibits 3 & 4, only that he shared the posts. Exhibits 1 and 2 were admitted; 3 and 4 were admitted over objection, but it was noted that objection went to the weight of evidence, and the father's claim he only shared those two posts would be considered by the court.(10/10/2018 N.T. pp. 92-95).

Counsel for J.P. issued subpoenas to have the minor children D.P. and R.P. attend the Permanency Review Hearing on September 9, 2018. OCY filed a Motion to Quash the Subpoenas. After a hearing prior to the start of the Review Hearing, the Motion to Quash was granted. (9/9/2018 N.T. pp. 3-32). Counsel for the father filed a Motion for Special Relief on October 19, 2018. The relief requested was for the reopening of the change of goal hearing, and appointment of separate legal counsel for the three oldest children to represent their legal interests at that hearing. The relief requested was Denied on October 26, 2018.

The Agency filed a Motion to Change Permanency Goal on July 5, 2018, indicating its desire to change the goal of D.P., R.P., J.P. and E.P.'s permanent placement from Reunification concurrent with Adoption to Adoption. This Court, after reviewing the testimony and evidence presented at the Permanency Review Hearings on September 9 and Octber10, 2018 found that the Agency met their burden by clear and convincing evidence and that the permanency goal

8

should be changed to Adoption. Services were terminated. An order was entered, on October 19, 2018, directing the Agency to file an Involuntary Termination of Parental Rights Petition.

## ISSUE PRESENTED

Appellant raises the following issue:

1.  The Juvenile Court committed an abuse of discretion and/or error of law when it determined the current permanency goal of reunification concurrent with Adoption was no longer feasible and changed the goal to Adoption.

## STANDARD OF REVIEW

When reviewing an appeal from a decree changing a permanency goal, an appellate court accepts the findings of fact and the credibility determinations of the juvenile court if they are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). An abuse of discretion standard is used by the appellate court.

An abuse of discretion is not found if the lower judgement was reasonable, the court applied the law, and the court's action was not a result of partiality, prejudice, bias, or ill will. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the lower court's decision, the decree must stand. *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007). In a change of goal proceeding, the lower court must focus on the child's best interests, not the interests of the parents. *Id.*

The Agency has the burden of proving the change in goal would be in the child's best interests. *In re M.B.*, 674 A.2d 702, 704 (Pa. Super. 1996).

9

# DISCUSSION

Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure provides that an appellant's Statement of Matters Complained of on Appeal "shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa, R.A.P. 1925(b)(4)(ii)."Issues not included in the Statement and/or raised in accordance with the provisions of this paragraph b (4) are waived." *Pa. R.A.P. 1925(b)(4)(vii).*

The Pennsylvania Superior Court, in the case of *In re A.B., 63 A3d 345 (Pa. Super 2013)*, summarized rulings regarding what constitutes a sufficient 1925(b) statement,

> Appellant's concise statement must properly specify the error to be addressed on appeal...The Rule 1925(b) Statement must be specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal...Further, this Court may find waiver where a concise statement is too vague...When a court has to guess what issues an appellant is appealing, it is not enough for a meaningful review...A Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all... .

*In re A. B., 63 A3d at 350.*

Appellant filed what she termed "Concise Statement Of Matters Complained Of On Appeal", and listed the one issue set forth above. The issue does not provide the Court any guidance as to what specific error was made, or where an abuse of discretion occurred. The mother's blanket statements that the court abused its discretion and/or erred in changing the permanency goal for the children from reunification to adoption, is a vague, overly broad claim that do not raise specific issues as required by Rule 1925(b). On that basis, the mother has waived any issues in this appeal. However, if these matters are not deemed waived, an analysis

10

of the law governing the standard for change of goal in dependency matters supports this Court's decision.

The mother admitted a history of allegations of abusive behavior on her part extending back to when the family lived in North Carolina. In June, 2017, the father filed a Protection from Abuse Petition on behalf of the children against the mother. The Petition was dropped when OCY removed the children and filed dependency petitions based in a large degree on the mother's abuse of the children. Both parents participated in therapy with Jessica Edmunds from Family Based Mental Health. The sessions started out as joint, but went to individual ones due to the "toxic" relationship between the parents involving arguments and fighting.

B.D., the mother, was afforded parenting education involving various techniques to care and deal with her children. These parenting sessions were also provided by Family Based Mental Health. Jessica Edmunds testified that throughout the involvement with the mother, from June 2017 to July 2018, the mother rejected any and all parenting suggestions she received from Family Based Mental Health.

On June 19, 2018, there was a supervised visit at OCY between B.D. and the oldest child, D.P. Ms. Edmunds observed the visit from outside the room, through a mirror. D.P. was in a bad mood that day and the mother kept pressing him as to what was wrong. Appropriate ways to talk to children was one of the topics covered in parenting education B.D. received, and rejected. The child began to get more agitated and told the mother she was not working hard enough to get the children back, then he talked about past abuse by the mother and said "if you hit me again, I'll hit you back. The mother responded that if D.P. raised a hand to her, "I'll beat your ass". The mother went on calling the child a liar, blamed him for the family being apart, and was screaming at him. This took place after a year of attempting to get the mother to

11

acknowledge deficiencies in her childrearing and providing methods to correct those deficiencies; all of which B.D. rejected.

After this visit, it was revealed that the mother had been taping her sessions with Family Based Mental Health without permission. As a result of the disastrous visit and revelation of unauthorized recording, Family Based Mental Health in July, 2018, discontinued services to the mother due to her being therapeutically not appropriate and the surreptitious recording.

The GAL for the children, Attorney Alison Scarpitti provided the court with a report of her meetings with the two oldest children, D.P. and R. P. prior to the September 9, 2018 Review Hearing. The children voiced some different opinions, but there was no divergence of opinion as to their feelings toward their mother. They were both afraid of her and concerned that their father wouldn't be able to stay away from or protect them from the mother. Obviously, the children's fears resulting from the abuse and lack of care they had received at the hands of their mother.

The Court finds that the reasons for the children's placement have not, nor will they be alleviated by the mother. In spite of all the efforts to help the mother overcome her abusive behavior and be able to care for her children, B.D. has shown no inclination to accept and absorb proper parenting techniques. After over a year of attempts to help the mother, she is as much a danger to them today as she was when they were removed. The change of goal to adoption has been established clearly and convincingly by OCY. A child's life will not be placed on hold "in the hope that (Appellant) will summon the ability to handle the responsibility of parenting". *In re Z.P.* 994 A.2d 1108, 1125 (Pa. Super. 2010)

12

## CONCLUSION

Appellant has continuously demonstrated she cannot or will not place her children's needs above her own. She refuses to accept responsibility for her actions. The skills and judgment necessary to provide for the physical and emotional well-being of her children are non-existent. Every effort was expended to provide the mother insight into her behavior and what affect it had on her children. B.D. rejected these efforts and the evidence indicates she will continue to do so in the future. A goal change to Adoption is therefore appropriate, despite any degree of minimal compliance with the permanency plan. It is respectfully requested the Superior Court affirm this Court's Order changing the goal of the dependency proceeding to Adoption.

Dated this ___ day of January, 2019.

BY THE COURT:

SHAD CONNELLY, SENIOR JUDGE

cc:     Attorney Anthony Vendetti
        Erie County Office of Children and Youth
        154 West 9th Street
        Erie, PA 16501

        Attorney Emily Merski
        3820 Liberty Street
        Erie, PA. 16509

        Attorney Elizabeth Brew Walbridge
        1001 State Street, Suite 1400
        Erie, PA 16501

        Attorney Alison Scarpitti
        150 East 8th Street, First Floor
        Erie, PA 16501

13